[No. G042984. Fourth Dist., Div. Three. Nov. 15, 2010.]

OVERHILL FARMS, INC., Plaintiff and Respondent, v.
NATIVO LOPEZ et al., Defendants and Appellants.

[black redaction bar]

[black redaction bar]

**COUNSEL**

Law Office of Carol A. Sobel and Carol A. Sobel for Defendants and Appellants.

Rutan & Tucker, Steven J. Goon and Chris M. Heikaus Weaver for Plaintiff and Respondent.

**OPINION**

**BEDSWORTH, J.—**

## INTRODUCTION

In 2009, the United States Internal Revenue Service (IRS) informed plaintiff Overhill Farms, Inc. (Overhill), that 231 of its then current employees had provided invalid Social Security numbers. Overhill was advised its use of invalid tax identification information exposed it to the imposition of penalties and criminal liability. Overhill contacted the employees identified by the IRS, advised them that their Social Security numbers were invalid according to the IRS, and provided them the opportunity to correct the erroneous information to avoid the termination of their employment with Overhill. One of the identified employees provided Overhill information showing that the employee's invalid Social Security number was an error. The remainder of the identified employees either admitted they had submitted an invalid Social Security number and were not authorized to work in the United States, or ignored Overhill's requests for information; their employment with Overhill was thereafter terminated.

Several of Overhill's employees, including defendants Teresa Cortez, Alma Salinas Renteria, Bohemia Y. Agustiano Saguilan, Marcelino Arteago, Agapita Padilla and Fernando Morales Lira, led by defendant Nativo Lopez, a "community activist" (collectively referred to as defendants), participated in protests outside Overhill's two plants and outside of one of Overhill's customers' place of business. Defendants' protest efforts included issuing a press release, carrying signs, and handing out leaflets, flyers, and handbills which stated, inter alia, that Overhill had used a "supposed discrepancy" in

Social Security numbers as a pretext for employment terminations which were both racist and a targeted attack on older and more senior employees.

Overhill sued defendants for defamation, intentional interference with prospective economic advantage, intentional interference with contractual relations, extortion, and unfair competition; all of Overhill's claims were based on alleged defamatory statements made by defendants in the course of the protests. Although Overhill sought damages, it alleged that defendants are "virtually judgment proof," and made clear that injunctive relief to prohibit future misconduct was its primary goal. Defendants filed an anti-SLAPP motion to strike the first amended complaint pursuant to Code of Civil Procedure section 425.16.[1] The trial court granted the anti-SLAPP motion as to the unfair competition claim, but otherwise denied the motion. The court concluded that although Overhill's claims arose out of protected conduct, Overhill had carried its burden of proving a probability of prevailing on the merits of all its claims except its unfair competition claim.

We affirm. Defendants' primary contention on appeal is that none of their alleged statements were actionable as defamation because none declared or implied a provably false assertion of fact under the totality of the circumstances. (See *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 19 [111 L.Ed.2d 1, 110 S.Ct. 2695] (*Milkovich*).) However, the statements reflected in defendants' written press release, leaflets and flyers accused Overhill of more than harboring racist attitudes; they accused Overhill of engaging in a mass employment termination based upon racist and ageist motivations. Such a contention is clearly a "provable fact"; indeed an employer's motivation for terminating employment is a fact plaintiffs attempt to prove routinely in wrongful termination cases. Nor can we excuse the statements on the basis they were made on "fully disclosed facts." The record indicates defendants revealed only very selected facts in support of their claims that Overhill had used the discrepancies in Social Security numbers as a mere pretext for the firings.

Defendants' other arguments fare no better. We presume there was substantial evidence to support the court's determination Overhill demonstrated a prima facie case in support of its other causes of action, and defendants did not demonstrate otherwise. Moreover, the bulk of defendants' contentions in connection with these causes of action rest on the assumption they did nothing wrongful in connection with their "peaceful protests." We have

---

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.'" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1 [3 Cal.Rptr.3d 636, 74 P.3d 737].)

All further statutory references are to the Code of Civil Procedure unless otherwise specified.

already concluded, however, that there is substantial evidence they made provably false statements in the course of those protests. Finally, we find no merit in defendants' assertion the court committed reversible error in its evidentiary rulings. Among other problems, there is no showing that the rulings, even if erroneous, were prejudicial.

## FACTS

Overhill is a publicly traded company which manufactures frozen food products and employs 1,000 employees in Vernon, California. Most of Overhill's production workers are members of the United Food and Commercial Workers Union, Local 770 (the union), which is their certified collective bargaining representative.

## I.

### THE IRS INFORMS OVERHILL SEVERAL OF ITS EMPLOYEES HAVE PROVIDED INVALID SOCIAL SECURITY NUMBERS; OVERHILL TERMINATES THE EMPLOYMENT OF THOSE EMPLOYEES IDENTIFIED BY THE IRS WHO FAIL TO PROVIDE A VALID SOCIAL SECURITY OR VALID TAX IDENTIFICATION NUMBER WITHIN 60 DAYS.

In 2008, the IRS conducted a revenue and payroll audit of Overhill. In 2009, the IRS notified Overhill that many of its employees provided invalid Social Security numbers and that it might be subjected to over $80,000 in penalties for its "role in reporting tax withholding through an invalid social security number." The IRS provided Overhill with a list identifying former employees and 231 then current employees, who had provided invalid Social Security numbers (the IRS list). An IRS agent orally informed Overhill's tax attorney that Overhill could not continue to employ anyone who was unable to provide a valid number.

On April 6, 2009, Overhill sent a letter to each of the employees identified on the IRS list, including Agustiano Saguilan, Renteria, and Cortez, which informed them that they had provided an invalid Social Security or tax identification number and offered them the opportunity to correct any errors or discrepancies within 30 days, during which time they would continue to be paid. Only one employee attempted to provide information showing the invalid Social Security number was an error. Overhill confirmed the invalid Social Security number was an error, corrected the mistake, and the employee remained employed with Overhill. A few other employees responded to the letter by admitting they had provided false Social Security numbers and permanent residence cards, and had entered the United States illegally. In

addition, 31 employees voluntarily resigned from their employment without addressing the invalid Social Security number issue.

However, the vast majority of the employees who were sent the letter (including Agustiano Saguilan, Renteria, and Cortez) did not respond to the letter or request additional time to correct the problem with their Social Security number. Notwithstanding their failure to respond to the April 6 letter, Overhill sent these employees a second letter on May 1, providing the employees an additional 30-day period (until May 31) to comply with the instructions. These employees were suspended, but continued to receive benefits at Overhill's expense through May 31.

Before making the final decision to terminate the employment of the employees who were identified on the IRS list and failed to provide information correcting the invalid Social Security numbers, Overhill's president and director of human resources met with representatives from the union who acknowledged that nearly all of the affected employees are not "authorized to work in the United States." In a letter dated April 30, 2009, the union's packinghouse director informed Overhill that "we are in the process of obtaining the tax payer identification numbers for those employees who have been identified with invalid social security numbers." However, the union never provided any such numbers or copies of any applications seeking to obtain such numbers.

Effective May 31, 2009, Overhill terminated its employment relationship with "all employees who had been identified by the IRS as having invalid social security numbers and who had failed to explain why they had furnished invalid numbers and/or still had not furnished valid numbers," which included Agustiano Saguilan, Renteria, and Cortez. Overhill explained to these employees that their failure to provide a valid Social Security or tax identification number exposed Overhill to audits and penalties by the IRS and to criminal liability if Overhill continued to use numbers the IRS had concluded were invalid.

## II.

### DEFENDANTS PROTEST OVERHILL'S RESPONSE TO IRS NOTIFICATION.

Defendant Nativo Lopez is the national director of Hermandad Mexicana Latinoamericana (HML) which is an organization "engaged in advocating for the rights for workers to come together to organize for fair treatment in the workplace." Lopez was approached by employees of Overhill "to help them organize in response to threatened mass firings of long-time employees" due to issues with their tax identification information.

Lopez agreed to help organize a response to Overhill's decision to terminate the employment of employees without valid Social Security numbers.[2] That response included issuing a press release dated June 3, 2009, conducting demonstrations in front of Overhill's plants at which participants carried signs, and distributed leaflets and flyers, and protesting in front of Panda Express, one of Overhill's customers, and passing out handbills there as well.

## A.

### The Press Release

The press release asserted employees were protesting "racist firings by Overhill," and explained that although "the company alleges discrepancy of social security numbers, . . . the Social Security Administration clearly establishes with employers that such discrepancy is NOT a cause for termination." The press release asserted that Overhill dismissed workers and "threatens to continue pursuing the policy of dismissing workers and replacing them with part-time workers who do not enjoy any benefits under the current collective bargaining agreement," and that "[i]t's no accident that many of the dismissed workers have the greatest seniority—many in excess of 10 and 15 years with the company, and numerous with 19 and 20 years of service."

## B.

### The Signs, Leaflets, and Flyers

The signs carried by participants during the demonstrations stated, "OVERHILL FARMS UNFAIR and RACIST EMPLOYER." The leaflets distributed at the protests contained the heading "OVERHILL FARMS UNFAIR AND RACIST." The leaflet explained that Overhill had recently terminated many of its employees "due to supposed discrepancy of information on their social security numbers" although "the Social Security Administration has declared in letters to both employers and employees that such discrepancy is NOT a cause for dismissal, lay-off, or suspension from employment." The leaflet asserted that Overhill's president has "used this as a pretext to eliminate one-fourth of [its] workforce, amongst the most senior, and replace them with part-time classified employees with no benefits." The leaflet further asserted, "[m]any of us are single female heads-of-household with various children" and that "[i]n this era of recycling, [Overhill's

---

[2] On May 4, 2009, Lopez met with Overhill's president, chief financial officer, and human resources director at which time Lopez was told that Overhill's actions were in response to an IRS audit and its obligation to comply with federal law. There is no evidence that the union was involved in any of the protests against Overhill.

president] has decided to recycle out the more senior workers and recycle in new, fresh, and innocent workers, but with lower wages and no benefits." The leaflet stated Overhill's president "is confident that we are passive and will accept this racist and discriminatory abuse against Latina women immigrants and our families without a fight. But he is wrong."

Protest participants also passed out flyers urging recipients to boycott Overhill, stating, as relevant to this appeal, that Overhill is "[a]n abusive and racist employer in the manner that it treats its workers," which "discriminates against Latinos"; has "unfairly terminated 300 workers," has "fired workers for expressing themselves freely according to the First Amendment of the U.S. Constitution," has "exploited Latinos for 30, 20, 15 and 10 years and then threw them to the streets—many single female heads-of-household," and has exploited part-time workers "visciously [*sic*] as if modern slavery were in place."

## C.

### *The Handbills Urging Panda Express Customers to Express Concern About the Employment Terminations at Overhill.*

Lopez also helped workers organize demonstrations at Panda Express, which is one of Overhill's customers, during which participants distributed handbills. The handbill urged customers to contact the corporate office of Panda Express "and tell them you are concerned about the unjust terminations and discriminatory treatment by Overhill Farms company to their employees." It further stated "[o]ver 300 workers were unfairly terminated by Overhill Farms, many of them with 10, 15, and 20 years seniority with the company."

## BACKGROUND

Overhill filed a first amended complaint against defendants alleging claims for defamation, intentional interference with prospective economic advantage, intentional interference with contractual relations, extortion, and unfair competition. Overhill's claims were based on defendants' alleged false statements regarding the circumstances surrounding Overhill's employment termination decision.

Defendants filed a special motion to strike under the anti-SLAPP law. The trial court granted the motion as to the unfair competition claim, but otherwise denied the motion. The trial court explained its ruling as follows: "The court finds that defendants met their burden of making a prima facie showing that the complaint arises out of the defendants' exercise of their

right of free speech as they have demonstrated that the complaint arises out of statements or writings made by defendants the majority of which occurred in a public forum, concerning an issue of public interest. However, the court further finds that plaintiff has met its burden of proof, at least with respect to the first four causes of action, establishing a probability of prevailing on the merits. Defendants are incorrect that federal labor law preempts state tort law under these circumstances. Defamation actions are not preempted where false statements of fact are made during the labor dispute with malice and actual injury. While referring to a plaintiff as 'racist' could be mere opinion under some circumstances, under the context of this dispute the clear implication of defendants' accusation was that they were fired because of their race. [Plaintiff] has submitted substantial evidence that this was not true. As for the other causes of action, they all arise out of the same conduct. The court does not find there is a probability of prevailing on the 17200 claim because there was no evidence to support the conclusion that defendants were engaged in a 'business' act or practice."

## DISCUSSION

Defendants contend the trial court erred by denying the anti-SLAPP motion as to their claims for defamation, intentional interference with prospective economic advantage, intentional interference with contractual relations, and extortion. Defendants further contend the trial court abused its discretion in overruling certain of defendants' objections to evidence Overhill produced in opposition to the motion and in sustaining certain of Overhill's objections to evidence defendants produced in support of the motion. No defendant contends on appeal that he or she was not personally responsible for any of the statements at issue in this case, or otherwise makes distinct arguments pertaining only to him or herself. Consequently, we will assume, for purposes of our analysis, Overhill produced sufficient evidence showing defendants were acting in concert in the publication of each of the alleged defamatory statements.

## I.

### SECTION 426.16 AND STANDARD OF REVIEW

"Section 425.16, subdivision (b)(1) requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the

statute. [Citation.] If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim. Under section 425.16, subdivision (b)(2), the trial court in making these determinations considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' " (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].) " 'The defendant has the burden on the first issue, the threshold issue; the plaintiff has the burden on the second issue. [Citation.]' " (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 928 [116 Cal.Rptr.2d 187].) To establish a probability of prevailing on a claim, " 'the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88–89 [124 Cal.Rptr.2d 530, 52 P.3d 703], quoting *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733], quoting *Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 548 [46 Cal.Rptr.2d 880].)

We independently review the trial court's order denying an anti-SLAPP motion de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325–326 [46 Cal.Rptr.3d 606, 139 P.3d 2].) " 'We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." [Citation.] However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." [Citation.]' [Citation.]" (*Id.* at p. 326.) We further observe that the anti-SLAPP statute is to be broadly construed. (§ 425.16, subd. (a).)

## II.

### Defendants Carried Their Burden of Showing Overhill's Claims Arose out of Protected Activity.

Here, the trial court concluded defendants carried their burden of demonstrating Overhill's claims arose out of protected activity within the meaning of section 425.16, subdivision (b)(1), and thus moved on to consider whether Overhill carried its burden of demonstrating the probability of prevailing on the merits of its claims.

In the opening brief, defendants argue the trial court erred in concluding they carried their burden on the first prong of section 425.16, subdivision (b)(1) only on the basis Overhill's claims were based on acts covered by section

425.16, subdivision (e)(3), because they contend the subject conduct also fell within protected conduct contained in section 425.16, subdivision (e)(1), (2) and (4). Although defendants state in the opening brief that "[t]he trial court correctly recognized that Defendants met their burden, and it is not an issue in this appeal," defendants devote seven pages in the opening brief and another four pages in the reply brief to arguing how they also carried their burden under these other subparts of section 425.16, subdivision (e). In the reply brief, defendants state: "Respondent contends that there is no issue on appeal concerning the applicability of the SLAPP statute because, once the court found that Appellants' 'acts' in furtherance of their speech and petition rights came within the scope of § 425.16[, subdivision] (e)(3), it was of no import that the trial court did not separately assess the applicability of any of the remaining prongs of § 425.16[, subdivision] (e) advanced by Appellants. [Citation.] The court's omission is crucial precisely because § 425.16[, subdivision] (e)(1) and (2) provide broader protection for statements made during or 'in connection with an issue under consideration or review by a legislative, executive or judicial body or any other official proceeding authorized by law.' "

Defendants' argument does not make sense. As the trial court found that the conduct underlying Overhill's claims was protected conduct within the meaning of the anti-SLAPP statute, contrary to defendants' assertion, they had nothing more to gain by demonstrating the conduct was protected under multiple provisions of section 425.16, subdivision (e). In any event, the trial court's order containing its ruling on the anti-SLAPP motion does not state the alleged conduct underlying Overhill's claims is only protected under section 425.16, subdivision (e)(3).

We therefore next consider whether the trial court erred by concluding Overhill demonstrated a probability of prevailing on its claims.

III.

OVERHILL DEMONSTRATED A PROBABILITY OF PREVAILING ON ITS
CLAIMS BECAUSE THEY ARE BASED ON A PROVABLY FALSE
STATEMENT OF FACT.

In the appellate briefs, the parties acknowledge that for purposes of the anti-SLAPP motion, the merit of Overhill's claims for intentional interference with prospective economic advantage, intentional interference with contractual relations, and extortion rise or fall on the merit of Overhill's defamation claim because all of these claims were based on wrongful conduct in the form of defendants making allegedly defamatory statements. We therefore focus our analysis on whether Overhill showed a probability of prevailing on its defamation cause of action.

## A.

### *Overhill Was Required to Show Defendants Declared or Implied a Provably False Assertion of Fact in Support of Its Defamation Claim.*

■ A claim for defamation, in the form of libel, can be based on "a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) Statements of opinion which imply a false assertion of fact are actionable. (*Milkovich, supra,* 497 U.S. at pp. 18–19.) In *Milkovich* the United States Supreme Court rejected the respondents' argument that statements of opinion are never actionable, explaining: "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead[s] to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." On the other hand, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." (*Id.* at pp. 18–20.)

In *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 [10 Cal.Rptr.3d 429] (*Franklin*), a panel of this court stated: "[A]fter *Milkovich,* the question is not strictly whether the published statement is fact or opinion. Rather, the dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. [Citations.] *Milkovich* did not change the rule that satirical, hyperbolic, imaginative, or figurative statements are protected because 'the context and tenor of the statements negate the impression that the author seriously is maintaining an assertion of actual fact.' [Citation.]" (See *Milkovich, supra,* 497 U.S. at p. 20 [noting that "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" are protected so as to ensure "that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation"]; *Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1048 [72 Cal.Rptr.3d 210] [" ' "Thus, 'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative sense' have all been accorded constitutional protection." ' "].)

In determining whether a statement declares or implies a provably false assertion of fact, courts apply the totality of the circumstances test. (*Franklin, supra*, 116 Cal.App.4th at p. 385.) "Under the totality of the circumstances test, '[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered.' " (*Ibid.*; see *Nygård, Inc. v. Uusi-Kerttula, supra*, 159 Cal.App.4th at p. 1049 [Court considers the totality of the circumstances "[t]o ascertain whether the statements in question are provably false factual assertions"].) Whether a challenged statement "declares or implies a provable false assertion of fact is a question of law for the court to decide [citations], unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood." (*Franklin, supra*, 116 Cal.App.4th at p. 385.)

## B.

### *Overhill Provided Evidence of Provably False Statements.*

In its first amended complaint, Overhill alleged defendants had accused it of, among other things, being "racist," and using an "alleged social security number discrepancy" as an excuse "to target[] long-term employees, especially women, Hispanics and older workers for termination." We review the evidence produced by Overhill in support of each of the alleged defamatory statements by defendants—which consists of the press release, signs, leaflets, flyers, and handbills—to determine whether Overhill satisfied its burden of providing a prima facie showing defendants made a provably false assertion of fact. In our view, it did.

Overhill produced evidence that defendants carried signs stating Overhill was a "Racist Employer" (some capitalization omitted), passed out leaflets stating that Overhill inflicted "racist and discriminatory abuse" on its workforce, passed out flyers stating Overhill was "abusive and racist" and "discriminates against Latinos," passed out handbills generally referring to "unjust terminations and discriminatory treatment by Overhill,"[3] and issued a press release stating in part that "IMMIGRANT WORKERS PROTEST RACIST FIRINGS BY OVERHILL FARMS."

The term "racist" is of course an exceptionally negative, insulting, and highly charged word—it is hard to imagine being called much worse. It is,

---

[3] The flyer contains several other statements that plaintiff has not relied upon in support of its defamation claim which include that plaintiff (1) is abusive in the manner that it treats it employees; (2) "stole time and money from its workers"; (3) "fired workers for expressing themselves freely according to the First Amendment of the U.S. Constitution"; and (4) "use[d] intimidation and fear and deception to control its work-force."

however, also a word that lacks precise meaning, so its application to a particular situation or individual is problematic; indeed, defendants contend no court has ever found the use of the term "racist" to be actionable defamation in a context similar to this one.

■ In *Stevens v. Tillman* (7th Cir. 1988) 855 F.2d 394, 402, for example, the Seventh Circuit Court of Appeals held that use of the term racist was not actionable under Illinois defamation law, observing (over 20 years ago) that the term lacked a precise meaning, can imply many different kinds of fact, and is no more than meaningless name calling. The appellate court further observed, "[t]he word has been watered down by overuse, becoming common coin in political discourse." (*Ibid.*) We agree that general statements charging a person with being racist, unfair, or unjust—without more—such as contained in the signs carried by protestors, constitute mere name calling and do not contain a provably false assertion of fact. Similarly, references to general discriminatory treatment, such as that contained in the handbill and flyer here, without more, do not constitute provably false assertions of fact. (See, e.g., *Beverly Hills Foodland v. United Food & Commercial Workers Union, Local 655* (8th Cir. 1994) 39 F.3d 191, 196 [" '[T]o use loose language or undefined slogans that are part of the conventional give and take in our economic and political controversies—like "unfair" and "fascist"—is not to falsify facts.' [Citation.]"].)

However, defendants did not merely accuse Overhill of being "racist" in some abstract sense. The press release contains language which expressly accuses it of engaging in racist *firings* and declaims upon the disparate impact the firings have had on "immigrant women." Similarly, after discussing Overhill's termination of one-fourth of Overhill's workforce, the leaflets explicitly assert that the discrepancy in Social Security numbers was merely a "pretext" to eliminate certain workers, and refer to Overhill's *conduct* as "racist and discriminatory abuse against Latina women immigrants." Moreover, in almost every instance, defendants' characterization of Overhill as "racist" is supported by a specific reference to its decision to terminate the employment of a large group of Latino immigrant workers. The assertion of racism, when viewed in that specific factual context, is not merely a hyperbolic characterization of Overhill's black corporate heart—it represents an accusation of concrete, wrongful conduct.

Surprisingly, defendants actually deny they ever asserted Overhill engaged in "racist firings," and go so far as to complain the court "improperly inferred" they had claimed the terminated employees were fired because of their race. According to defendants, their leaflets and materials state only "that the terminated employees were fired due to purported social security

discrepancies," and they were complaining only because they viewed termination *on that basis* to be "unfair." Even ignoring the fact that defendants' press statement uses the phrase "racist firings by Overhill" in its title, this argument is disingenuous.

The gist of the press statement, leaflets and flyers was that while Overhill was *claiming* the employment terminations were based strictly on the disparities in Social Security numbers, that claim was false, as the Social Security Administration had decreed that such discrepancies were not grounds for termination. Thus, defendants were clearly portraying the "supposed" discrepancies as merely convenient cover for Overhill's true, racist, intent. Indeed, the leaflet *explicitly* characterizes the Social Security number discrepancies as a mere "pretext" for the firings. Defendants' assertion no such contention was made is disturbingly inconsistent with their own writings.

■ And a claim of racially motivated employment termination is a provably false fact. Indeed, that very fact is subject to proof in wrongful termination claims on a regular basis. If we were to conclude that an employer's racist motivation for terminating an employee's job were not "provable," it would come as a great shock to the Fair Employment and Housing Commission. (See Gov. Code, § 12900 et seq.)

Of course, we recognize that certain factual claims, if based upon " 'fully disclosed' " facts, " 'can be punished only if the stated facts are themselves false and demeaning.' [Citation.] The rationale for this rule is that '[w]hen the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts.' [Citation.] When the facts supporting an opinion are disclosed, 'readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts.' ([Citation]; see also *Partington v. Bugliosi* (9th Cir. 1995) 56 F.3d 1147, 1156–1157 ['when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment']; *Chapin v. Knight-Ridder, Inc.* (4th Cir. 1992) 993 F.2d 1087, 1093 ['[b]ecause the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related']; *Phantom Touring, Inc. v. Affiliated Publications* (1st Cir. 1992) 953 F.2d 724, 730 [if author discloses basis for statement, it can only be read as the author's 'personal conclusion about the information presented, not as a statement of fact'].)" (*Franklin, supra,* 116 Cal.App.4th at p. 387, quoting *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438–1439.)

However, that rule is of no assistance to defendants, for the simple reason that their statements do not fully and accurately disclose the facts surrounding the firings. While defendants' press release and leaflets do acknowledge that an "alleged" or "supposed" discrepancy in Social Security numbers led to their firing—and claim that "such a discrepancy" is not grounds for termination of employment—they do not even begin to acknowledge the full story, i.e., that Overhill did not fire anyone merely because a "discrepancy" had been identified. What actually happened is that Overhill notified the affected employees their Social Security numbers had been identified as "*invalid*," gave them substantial opportunity to resolve the problem and provide a valid number, and terminated the employment of only those who either admitted falsifying their documents, or failed or refused to respond to the issue at all. While the mere identification of a discrepancy may not be grounds for firing, an employee's failure or refusal to correct an invalid Social Security number and supply a proper one, when asked by the employer to do so, is an entirely different matter.[4]

The evidence here was sufficient to demonstrate that defendants' disclosure of facts underlying the employment termination was materially incomplete and misleading, making their "racist firing" claim sound far more credible than it actually is. Consequently, the rule that " '[a] statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning . . .' [citation]" (*Franklin, supra,* 116 Cal.App.4th at p. 387), does not apply here.[5]

---

[4] The facts supplied by defendants were inaccurate, as well as incomplete. Even if it were acceptable, in the abstract, to characterize an invalid Social Security number which the employee fails to correct as a "discrepancy" in the number, and thus to claim Overhill's employees were fired for a mere "discrepancy," such a claim is not accurate when coupled with the assertion that the Social Security Administration has declared that "*such a discrepancy* is not a cause for dismissal, lay-off or suspension from employment," as defendants did here. Because, in contrast to an innocent and curable "discrepancy" in a Social Security number, an employee's failure to explain or correct an invalid Social Security number, after being notified of the problem and asked to do so, clearly is grounds for firing. Consequently, defendants' statements either inaccurately characterized the Social Security problem in this case as a mere "discrepancy," or inaccurately claimed that "such a discrepancy" was not grounds for termination. Either way, the claim was inaccurate.

[5] The common dictionary definition of a discrepancy is "a divergence or disagreement." That is an accurate description of the condition caused by the IRS list. But once the employee had admitted the falsity of their Social Security numbers or simply failed to respond to Overhill's repeated inquiries, there was no longer a "discrepancy." It is not a "disagreement" when one side has admitted error or refused to discuss it.

We do not believe it necessary to parse defendants' statements that closely to see the error in their position, but it does serve to emphasize the stretch they have had to make to raise the argument.

## C.

*The Characterization of This Case as Arising from a "Labor Dispute" Does Not Help Defendants.*

Defendants also contend the court erred in refusing to apply a heightened burden of proof to Overhill's claims, and gave only "cursory" attention to their argument that such a standard was appropriate because the case arises out of a classic "labor dispute." Defendants do not, however, cite to any part of the record demonstrating either what standard of proof the court applied, or that the court actually refused to apply the one they sought. This failure to cite to evidence in the record requires us to presume the court applied the correct standard. The claim is waived.

But even if the claim were not waived, we would conclude the evidence produced by Overhill in this case was sufficient to meet even the heightened standards applicable to a claim of defamation made in the context of a classic labor dispute.[6]

According to defendants, a claim of defamation which arises in a labor dispute enjoys the same First Amendment protections which are applied to allegedly defamatory statements made against a public figure—the standard announced in *New York Times v. Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710]. (*Linn v. Plant Guard Workers* (1966) 383 U.S. 53 [15 L.Ed.2d 582, 86 S.Ct. 657].) Thus, in order to prevail, a plaintiff must not only establish a provably false statement of fact, but also demonstrate that a defendant made the statement with "knowledge of its falsity, or with reckless disregard of whether it was true or false." (*Id.* at p. 61; see *Letter Carriers v. Austin* (1974) 418 U.S. 264, 274 [41 L.Ed.2d 745, 94 S.Ct. 2770].)

The evidence produced by Overhill was sufficient to satisfy that standard. Overhill provided substantial evidence defendants either knew, or recklessly disregarded, facts demonstrating that they had not fired hundreds of Latino

---

[6] Whether this case does arise out of a "labor dispute" for purposes of applying a higher standard of proof to the defamation claim is not an issue we need to decide, as we conclude the evidence produced by Overhill was sufficient to satisfy even the heightened standard claimed by defendants. While tactics employed by defendants to make their point are similar to those traditionally employed in a labor dispute governed by the National Labor Relations Act (see 29 U.S.C. § 152), we note the dispute itself was closer to a wrongful termination case—it did not involve the union which actually represented Overhill's employees, was unrelated to the existing collective bargaining agreement, and did not include efforts to negotiate or approve a new collective bargaining agreement or to change a policy affecting all employees equally. It was, in the main, an effort to force an employer to rescind an adverse employment decision based upon the *individual conduct* of the employees involved.

employees based solely on having been notified of a potentially innocent discrepancy in Social Security numbers which even the federal government would not deem sufficient to warrant termination. There was evidence the affected employees were specifically told their Social Security numbers were identified as "invalid," and were given opportunities to rectify the problem, but failed to do so. There was evidence Overhill communicated those facts to the union which represented its employees, as well as to the remaining employees directly, and no evidence that either Overhill or the union refused to explain the employment termination decision to any employee who inquired. There was evidence both the union, and defendant Lopez, explicitly acknowledged that the affected employees were not authorized to work in the United States. This evidence, taken together, was sufficient to constitute a prima facie showing defendants made their defamatory "racist firing" claims with either knowledge of their falsity, or reckless disregard for their truth.

## IV.

### THE COURT DID NOT ERR IN REFUSING TO STRIKE OVERHILL'S REMAINING CAUSES OF ACTION.

Defendants also challenge the sufficiency of the evidence to sustain Overhill's claims for intentional inference with prospective economic advantage, intentional interference with contractual relations and extortion. Defendants' primary argument is that each of these claims is dependent upon the sufficiency of the defamation claim, which it characterized as lacking. As we have already explained, we find that argument unpersuasive. As we now explain, we find defendants' alternative arguments with respect to these other claims to be unpersuasive as well, and conclude the court did not err in refusing to strike them.

### A.

#### Interference with Prospective Economic Advantage

Defendants challenge Overhill's cause of action for interference with prospective economic advantage by arguing Overhill failed to provide any evidence of actual disruption or harm to an existing economic relationship. Specifically, defendants point to Overhill's evidence that one of its customers, fresh & easy, subjected it to an "ethics audit," which focused on questions about "immigration issues," in the wake of defendants' alleged defamatory statements. Defendants claim this evidence shows "mere temporal proximity" between their conduct and the audit, and was inadequate, as a matter of law, to demonstrate causation. (See *Franklin, supra,* 116 Cal.App.4th 375.) We cannot agree.

Although some cases have suggested that temporal proximity, alone, might be insufficient to demonstrate a causal relationship, we view the issue as more complex than that, and largely dependent upon the degree of proximity and the likelihood of a cause-and-effect relationship. For example, if a plaintiff offers evidence that a defendant's boat struck his broadside, and within five minutes his boat started to sink, we think that would be sufficient evidence, in and of itself, to support an inference of causation. By contrast, a plaintiff's evidence that his boat sank 10 days after being hit by a defendant's, is significantly less compelling, and might be insufficient, by itself, to suggest any causal relationship. And if a plaintiff were to testify the sun goes down *every night* within *moments* of when he takes his first sip of a gin and tonic, we would conclude the evidence was insufficient, as a matter of law, to support any inference his imbibing actually caused the sun to set.

■ Thus, while *Motorola Communication & Electronics, Inc. v. Department of General Services* (1997) 55 Cal.App.4th 1340, 1345 [64 Cal.Rptr.2d 477], does state that "[m]ore than *post hoc, ergo propter hoc* must be demonstrated," the case cannot be fairly characterized as stating an inflexible rule that such evidence would be insufficient in all cases. Indeed the *Motorola* court itself actually states the opposite, noting "[a]lthough, in the absence of other evidence, timing alone *may be sufficient* to prove causation, the present matter involves much more." (*Ibid.*, italics added.) Thus, as the *Motorola* court makes clear, the real issue is whether, in the circumstances of the case, the proximity of the alleged cause and effect tends to demonstrate some relevant connection. If it does, then the issue is one for the fact finder to decide.

Here, Overhill provided evidence that fresh & easy began questioning Overhill's termination of the employees within two weeks of its occurrence and called for what they referred to as an "audit" of Overhill's labor practices almost immediately. They also showed that fresh & easy had never done anything similar in the past. We think that evidence was sufficient to support an inference of causation, which is all that is necessary in this procedural posture.

Defendants also suggest there was no direct evidence the relationship between Overhill and fresh & easy was actually disrupted, because Overhill otherwise acknowledged it expected the relationship to continue into the future. Defendants contend this concession demonstrates "no harm, no foul." While the Chick Hearn approach to jurisprudence has its place, the contention here lacks merit because the evidence cited reflects only that, prior to the defamatory conduct, Overhill "had every expectation that this relationship would continue." That statement merely supports the conclusion Overhill anticipated a "prospective" economic relationship with fresh & easy *at the time of the alleged defamation.*

In any event, defendants cannot challenge the sufficiency of the evidence supporting Overhill's prima facie case by simply attacking one factual claim, without otherwise making any attempt to summarize or analyze the entirety of the evidence pertaining to that point. "It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence. (*Brown v. World Church* [(1969)] 272 Cal.App.2d 684, 690 [77 Cal.Rptr. 669].) This burden is a 'daunting' one. (*In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 328–329 [249 Cal.Rptr. 798].) 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient.* [Citation.]' (*Roemer v. Pappas* (1988) 203 Cal.App.3d 201, 208 [249 Cal.Rptr. 743], italics added.) '[W]hen an appellant urges the insufficiency of the evidence to support the findings it is his duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient. He cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked his responsibility in this respect.' (*Hickson v. Thielman* (1956) 147 Cal.App.2d 11, 14–15 [304 P.2d 122].)" (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409 [58 Cal.Rptr.3d 527].)

Defendants have not done so, and have not established the court erred in rejecting the motion to strike Overhill's cause of action for interference with prospective economic advantage.

## B.

### *Tortious Interference with Contractual Relations*

Defendants contend Overhill's claim for interference with contractual relations is preempted by the National Labor Relations Act (NLRA; 29 U.S.C. § 151 et seq.), but cite no authority for such preemption involving a claim asserted against third parties based upon defamatory conduct. The case cited by defendants in support of their contention is *Operating Engineers v. Jones* (1983) 460 U.S. 669, 677–678 [75 L.Ed.2d 368, 103 S.Ct. 1453], which held only that an employee's state law claim for interference with his employment contract, *filed against the union itself*, was preempted by the NLRA.

The claim in this case does not involve any claims asserted between the employer and the union. Nor is this case merely based upon "grievances filed by Defendants and other[s] and the 'threat' of continued presumptively protected peaceful labor picketing." In fact, it is based upon neither of those things. Overhill never challenges defendants' rights to pursue individual labor grievances or to engage in "protected peaceful labor picketing." If it had, defendants' preemption argument might have merit.

■ But this case is based instead upon defamatory conduct, and as defendants otherwise concede, liability based on such conduct is not pre-empted. Indeed, as the Supreme Court has expressly held "in *Linn* v. *Plant Guard Workers*[, *supra*, 383 U.S. 53], we held that an action for a malicious and injurious libel in the course of a labor dispute, although an unfair practice and prohibited by the Act, was not pre-empted since it was unprotected conduct and since remedying injury to reputation was of only slight concern to the national labor policy and was a matter deeply rooted in state law." (*Operating Engineers v. Jones, supra*, 460 U.S. at p. 681, fn. 11.)

Defendants' alternative assertion, that Overhill "failed to establish [it] suffered an actual breach of its relationship with the Union or actual damages as a result of the grievances that were filed" is waived, as this contention also amounts to an attack on the substantiality of the evidence in support of those points, and it is unaccompanied by any attempt to summarize or analyze the evidence pertaining to that point. Indeed, the passage quoted in the previous sentence is the entire argument. It is insufficient.

## C.

### Extortion

Defendants also challenge the court's refusal to strike the cause of action for extortion, but largely base their argument on the assertion there is no evidence they engaged in any actions amounting to the wrongful use of "force or fear." They note, for example that "[A] person, generally speaking, has a perfect right to . . . provide information to newspapers." (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1079 [267 Cal.Rptr. 457].) But here again, defendants are simply assuming the "information" they chose to provide was accurate, and that no reasonable fact finder could conclude it was defamatory. As we have already explained, we reject this argument.

We also reject the assertion that no extortion claim could be based upon a continuing threat by defendants to portray Overhill as having engaged in a mass employment termination for racist reasons, based upon nothing more than the fact they had already begun doing so. As defendants themselves acknowledge, their alleged threat was embodied in their continuing plan to "organize a lawful boycott [against Overhill]." Such a plan, if based upon false allegations of Overhill's racist motivations for a mass firing, is not "lawful" and is clearly intended to impute disgraceful conduct to Overhill.

Moreover, if the plan were successful, it would clearly subject Overhill to additional future harm—the fact that *some people* may already view Overhill as having racist or ageist employment policies based upon defendants' efforts does not mean that additional airing of those assertions (to a new audience or to further convince those who might have heard it already but were skeptical) would not cause further harm. To the contrary, a future "boycott" of Overhill is clearly further harm. Thus, such a threat, if used as a lever to force Overhill to submit to defendants' demands that terminated employees be rehired, would qualify as extortion.

## V.

### DEFENDANTS FAILED TO DEMONSTRATE THE COURT'S EVIDENTIARY RULINGS AMOUNTED TO REVERSIBLE ERROR.

Defendants' final argument is that the court erred in various evidentiary rulings. They first assert the court erroneously sustained objections to portions of their own declarations, in which they purportedly claimed they had "read letters" regarding the terminations, "formed the belief that the discrepancy in social security numbers did not require termination" and engaged in "peaceful picketing." They also purportedly claimed to have formed the belief that the terminations were merely "used as an opportunity to replace long-term, higher paid workers with part-time, lower paid workers."[7] Presumably, this testimony was intended to support the assertion defendants acted in good faith when making the allegedly defamatory accusations at issue in this case.

. But even assuming defendants' characterization of the evidence is correct, we cannot conclude the court committed reversible error in excluding it. The testimony, as related by defendants in their brief, appears clearly conclusory, offering no real information as to how these employees "formed the belief" that a discrepancy in their Social Security number could not be a basis for termination, or whether they also believed that ignoring the employer's specific request to correct an invalid Social Security number was no basis for termination. Consequently, a "no foundation" objection to these conclusory claims appears well taken. (Evid. Code, § 403.)

---

[7] We say "purportedly" not to cast aspersions on the content of the declarations, but because defendants do not specifically quote the objected-to portions of the declarations in their opening brief, and provide us with a record citation to only the court's ruling. And that ruling, of course, does not provide us with any indication as to where we might locate the declarations within the appellate record.

But even if the claims were technically admissible—defendants claim that individuals "need not provide facts upon which their beliefs were based" (citing Evid. Code, § 702)—the belief evidence is so weak we cannot conceive of how its inclusion would have been likely to change the outcome of the motion to strike. Moreover, Overhill's burden in defeating the anti-SLAPP motion was merely to demonstrate a prima facie case—it was not required to conclusively negate the possibility that defendants (or some of them) might have acted with subjective good faith. As we have already explained, there was sufficient evidence to demonstrate defendants knew (or were recklessly indifferent to knowing) their allegedly defamatory statements did not accurately portray the circumstances of Overhill's decision to terminate the employment of workers with invalid Social Security numbers. That is all Overhill was required to prove. The fact defendants themselves may claim otherwise simply does not change the analysis at this point in the proceedings.

Moreover, as Overhill points out, defendants have made no effort to establish the error, if any, was actually prejudicial. It is their burden on appeal to do so, and thus the claim of error is waived. (§ 475; see Cal. Const., art. VI, § 13.)[8]

Defendants also contend the court erred in failing to sustain some of their objections to the evidence submitted by Overhill. They identify the problematic evidence as "statements in the declarations of Diaz and Rudis, which Defendants challenged as hearsay, speculations, improper opinions and unsupported conclusions regarding Defendants' state of mind in the 'actual' malice proof." They do not specifically quote or otherwise fully identify the evidence they refer to. The failure to do so amounts to a waiver of the contention. " 'An appellant must affirmatively demonstrate error through reasoned argument, citation to the appellate record, and discussion of legal authority.' " (*Sakaguchi v. Sakaguchi* (2009) 173 Cal.App.4th 852, 862 [92 Cal.Rptr.3d 717], quoting *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 685 [71 Cal.Rptr.3d 775].)

---

[8] Section 475 provides: "The court must, in every stage of an action, disregard any error, improper ruling, instruction, or defect, in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of the parties. No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown."

Here, defendants merely attempt to *characterize* (rather than quote) only *one portion* of the allegedly objectionable evidence, and do not even disclose the content of the rest of what they objected to. This precludes any determination they presented a "reasoned argument" about the admissibility of that content.

With respect to the one portion of testimony actually delineated by defendants, we discern no potential for prejudice—and again, defendants make no effort to demonstrate such prejudice. Specifically, defendants claim the purported statements by witness Diaz, to the effect that she "knows, based on her own Latina heritage that the company does not discriminate," were inadmissible. But again, because Overhill was only required to demonstrate a prima facie case, that purported statement is of no particular significance. Other evidence offered by Overhill was sufficient to demonstrate that its decision to terminate hundreds of workers was based upon reasons other than race, contrary to the claims made by defendants in their allegedly defamatory statements. Thus, Overhill demonstrated its prima facie case without regard to any opinion offered by a Latina employee, and the inclusion or exclusion of that statement was of no consequence.

In light of the foregoing, we are thoroughly convinced defendants have failed to demonstrate the court's evidentiary rulings had any discernable impact on its decision to deny the bulk of their anti-SLAPP motion. Consequently, those rulings provide no basis for reversing the decision.

## DISPOSITION

The order is affirmed. Overhill shall recover its costs on appeal.

Rylaarsdam, Acting P. J., concurred.

**FYBEL, J.,** Dissenting.—I respectfully dissent.

The First Amendment to the United States Constitution guarantees a cherished freedom–the right to speak openly and freely. (U.S. Const., 1st Amend. ["Congress shall make no law . . . abridging the freedom of speech . . ."].) Within the past few years, the United States Supreme Court has broadly protected speech in a public forum in the analysis of permissible speech by candidates for judicial office (*Republican Party of Minn. v. White* (2002) 536 U.S. 765 [153 L.Ed.2d 694, 122 S.Ct. 2528]), and of corporations in elections (*Citizens United v. Federal Election Comm'n* (2010) 558 U.S. ___ [175 L.Ed.2d 753, 130 S.Ct. 876]). The anti-SLAPP (strategic lawsuit against public participation) statute provides that it should be construed broadly to protect against "lawsuits brought primarily to chill the valid exercise of the

constitutional rights of freedom of speech and petition for the redress of grievances." (Code Civ. Proc., § 425.16, subd. (a).)

Defendants' anti-SLAPP motion should have been granted because none of defendants' statements contains actionable defamation. The statements describe Overhill Farms, Inc.'s (Overhill), firing of a large number of Hispanic and female employees as "racist" and "discriminatory" in the context of vigorous public protests. Overhill failed to produce evidence showing defendants declared or implied a provably false assertion of fact within the meaning of the First Amendment and defamation law jurisprudence (see *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 19 [111 L.Ed.2d 1, 110 S.Ct. 2695]); thus, Overhill's defamation claim fails as a matter of law. The majority opinion is an unprecedented and unwarranted extension of defamation law and is contrary to the First Amendment.

By this lawsuit, Overhill seeks to curb and chill employee protests. As acknowledged by the majority opinion, Overhill has "made clear that injunctive relief to prohibit future misconduct was its primary goal." (Maj. opn., *ante*, at p. 1252.) (See *Nebraska Press Assn. v. Stuart* (1976) 427 U.S. 539, 559 [49 L.Ed.2d 683, 96 S.Ct. 2791] ["If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time."].) To illustrate this point, would it be actionable if the Los Angeles Times, the Orange County Register, Fox News, or MSNBC complained that actions by anyone were "racist" or "discriminatory"? Of course not. Employees complaining about their employer enjoy the same protection.

Considering defendants' speech under the totality of the circumstances in this case, their speech too is constitutionally protected from a civil suit. In my view, Overhill is perfectly capable of ably presenting its side of the story in the public forum and has done so. Justice Brandeis's statement in *Whitney v. California* (1927) 274 U.S. 357, 377 [71 L.Ed. 1095, 47 S.Ct. 641] (conc. opn. of Brandeis, J.) is apt: "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." Defendants' assertions might not be persuasive, but they are not actionable.

I.

LEGAL PRINCIPLES THAT GOVERN THIS CASE HAVE BEEN MISAPPLIED IN THE MAJORITY OPINION.

I begin my analysis by reviewing the legal points where the majority and I agree. I agree that in order to survive defendants' anti-SLAPP motion,

Overhill had the burden of producing evidence to show defendants' statements included a provably false assertion of fact *under the totality of the circumstances* pursuant .to the United States Supreme Court's decision in *Milkovich v. Lorain Journal Co., supra*, 497 U.S. at page 19. (See *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 [10 Cal.Rptr.3d 429] (*Franklin*).) (Maj. opn., *ante*, at p. 1252.) I also agree with the majority opinion's conclusion that the term "racist" is "a word that lacks precise meaning, so its application to a particular situation or individual is problematic." (Maj. opn., *ante*, at p. 1262.) Indeed, Overhill itself states in its respondent's brief, "Overhill has never contended that the use of the word 'racist' as a stand-alone epithet is actionable."

As discussed in detail *post*, I part company with the majority opinion in two fundamental respects. First, my colleagues in the majority have incorrectly made this court the first state or federal appellate court in America, ever, to hold that the epithet "racist" constitutes a provably false assertion of fact as the basis of a claim of defamation. The majority attempts to argue that it is only so holding because the term "racist" was used in combination with other words. But those other words are not actionable and the majority does not and cannot argue otherwise. Whether the word "racist" is used as a noun or an adjective in combination with other words does not matter.

Second, in my view, the majority misapplies the United States Supreme Court opinions in *Milkovich v. Lorain Journal Co., supra*, 497 U.S. at page 19 and *Linn v. Plant Guard Workers* (1966) 383 U.S. 53, 58 [15 L.Ed.2d 582, 86 S.Ct. 657]. Defendants' communications in their dispute with their employer simply did not contain a provably false fact and the reasons for their allegations were disclosed. (*Franklin, supra*, 116 Cal.App.4th at p. 387.) The majority opinion's parsing of the one word "discrepancies" in reaching its conclusion is not consistent with United States Supreme Court jurisprudence in defamation cases. I agree the employees' claims might not be persuasive, but that does not make them defamatory.

## II.

### OVERHILL FAILED TO PRODUCE EVIDENCE SHOWING DEFENDANTS MADE ANY PROVABLY FALSE ASSERTION OF FACT.

Overhill argues it produced prima facie evidence of defamation showing defendants made the following statements: (1) Overhill is a racist employer; (2) "Overhill targeted women, Hispanics and older workers for termination"; (3) "Overhill targeted long-term employees and replaced them with part-timers with no benefits"; (4) "Workers were fired for a social security number 'discrepancy' which is 'not a cause for termination' "; and (5) "Overhill

replaced the employees in violation of a union contract." The majority opinion concludes defendants' statements asserting that Overhill was racist and discriminated against Hispanics and women in its handling of the invalid Social Security numbers and defendants' characterization of the problem with the Social Security numbers as a discrepancy showed they asserted a provably false statement of fact. The majority opinion does not conclude any of the other statements were defamatory so I do not analyze those statements as none of them contains a provably false statement of fact either.

## A.

### Defendants' Statements Regarding the Termination of Employment of Hispanic and Female Employees Did Not Include a Provably False Assertion of Fact.

It is undisputed that Overhill terminated the employment of a large number of employees who were Hispanics and women. Overhill contends defendants defamed it by characterizing Overhill's conduct as racist and discriminatory.

As the majority opinion acknowledges, the simple use of the terms "racist" and "discriminatory" does not constitute actionable defamation because such terms lack precise definition and are hard to prove. (See, e.g., *Stevens v. Tillman* (7th Cir. 1988) 855 F.2d 394, 402 [neither general statements charging a person with being racist, unfair, unjust, nor references to general discriminatory treatment, without more, constitute provably false assertions of fact]; *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655* (8th Cir. 1994) 39 F.3d 191, 196 [use of terms like "unfair" and "fascist," the court stated, " 'is not to falsify facts' "].)

Here, defendants did not merely utter the terms "racist" and "discriminatory" in a vacuum. The press release states that Overhill engaged in racist firings, and references the disparate impact the firings had on "immigrant women." The leaflets state the discrepancies in Social Security numbers were used as a pretext to eliminate certain workers, and refer to Overhill's conduct as "racist and discriminatory abuse against Latina women immigrants."

In applying the totality of the circumstances test (*Franklin, supra*, 116 Cal.App.4th at pp. 385–386), we consider not only the language used, but also its context. Here, without exception, defendants' statements were made in the context of indisputably heated protests and demonstrations concerning Overhill's decision to terminate the employment of a large number of employees who were identified on the IRS list and failed to provide valid Social Security or tax identification numbers.

In *Linn v. Plant Guard Workers, supra,* 383 U.S. at page 58, the United States Supreme Court observed: "Labor disputes are ordinarily heated affairs; the language that is commonplace there might well be deemed actionable *per se* in some state jurisdictions. Indeed, representation campaigns are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." The Supreme Court in *Linn* " 'acknowledge[d] that the enactment of § 8(c) [of the NLRA [(National Labor Relations Act)]] manifests a congressional intent *to encourage free debate on issues dividing labor and management*' [citation] and that the National Labor Relations Board leaves ' "to opposing parties the task of correcting inaccurate and untruthful statements." ' " (*Sutter Health v. UNITE HERE* (2010) 186 Cal.App.4th 1193, 1206 [113 Cal.Rptr.3d 132], italics added.)[1]

Although the demonstrations and protests in the instant case did not involve a union and thus might not constitute a "labor dispute" in the traditional use of the phrase, the context is similar.[2] The audience to which the press release was addressed and to whom the leaflets were distributed outside Overhill's plants and a Panda Express restaurant would reasonably understand from the context that the use of the term "racist" as attributed to Overhill and its conduct constituted rhetorical hyperbole. This hyperbole reflected the demonstrators' contempt, frustration, and desperation in connection with their employment situation. (*Franklin, supra,* 116 Cal.App.4th at p. 389 [the " 'contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed' "].)

But even if the audience of such publications might not construe such statements as rhetorical hyperbole, a closer examination of the language of the press release and the leaflets reveals the absence of any charge that Overhill made its decision to terminate certain employees' employment

---

[1] The *Linn* court, however, also noted that although " 'tolerat[ing] intemperate, abusive and inaccurate statements made by [a] union during attempts to organize employees,' the National Labor Relations Board 'does not interpret the Act as giving either party license to injure the other intentionally by circulating defamatory or insulting material known to be false.' " (*Sutter Health v. UNITE HERE, supra,* 186 Cal.App.4th at p. 1206.)

[2] The National Labor Relations Act defines the term "labor dispute" as "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." (29 U.S.C. § 152(9).) In *Sutter Health v. UNITE HERE, supra,* 186 Cal.App.4th at page 1207, the appellate court stated, " ' "[w]here the union acts for some arguably job-related reason, and not out of pure social or political concerns, a 'labor dispute' exists." ' "

*because* they were Hispanic or female. The press release and the leaflets expressly state that the impetus for the termination of employment decision was the problem of certain employees having discrepancies with their Social Security numbers, thus advising the reader that Overhill's decision did not come out of thin air. A careful reading of these publications shows the authors attribute Overhill with having made a *racist* decision because its decision to terminate the employment of employees with unresolved invalid Social Security numbers turned out to affect a large number of "Latina women immigrants."

In addition, as acknowledged in the majority opinion, " '[a] statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning.' [Citation.] The rationale for this rule is that '[w]hen the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts.' " (*Franklin, supra,* 116 Cal.App.4th at p. 387.) Here, the press release and the leaflets disclosed the facts underlying their use of the word "racist" and reference to the termination of employment of Latina females.

Overhill does not dispute that its decision to terminate the employment of those employees who had unresolved invalid Social Security or tax identification numbers affected a large number of Hispanics and women. Overhill does not dispute that the Social Security Administration has stated that a discrepancy with a Social Security number, in and of itself, is not a terminable offense. Contrary to Overhill's characterizations of defendants' statements in the majority opinion and the respondent's brief, none of the protest documents (the press release, signs, leaflets, flyers, and handbills) relied upon by Overhill states that it *targeted* Hispanics or Latinos in making its decision to terminate employment.

## B.

### *Defendants' Statements That Overhill Terminated Employment Because of "Discrepancies" in Social Security Numbers Is Not a False Statement.*

The majority opinion reasons Overhill was defamed by the press release's and the leaflets' statements that the employees' employment was terminated due to "discrepancies" in the Social Security numbers because the evidence shows they had *invalid* Social Security numbers that they failed to correct. But having an invalid Social Security number can be fairly characterized as having a discrepancy in the Social Security number. Even if the word

"discrepancy" can be parsed so thin to perhaps mean something else, the First Amendment and defamation law do not support resting liability on so weak a basis. To the extent Overhill contends the audience of such statements might not understand the careful consideration Overhill gave to the employment termination decisions by defendants' reference to Social Security number discrepancies, Justice Brandeis's statement in *Whitney v. California, supra,* 274 U.S. at page 377 (conc. opn. of Brandeis, J.) is again apt: "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." Overhill was free to issue its own press release or distribute its own leaflets to communicate more details surrounding the discrepancies in the Social Security numbers.

As discussed *ante*, Overhill does not dispute that a discrepancy in a Social Security number might be insufficient "cause" for employment termination without more. The reference to the Social Security Administration's statement that such discrepancies do not constitute such cause does not mean that Overhill was outside of its rights in making the employment termination decisions in this case. As discussed *ante*, there is no evidence defendants made any statement Overhill violated the collective bargaining agreement with the union in implementing the employment termination decisions. Overhill has therefore failed to establish a provably false statement of fact in this regard as well.

III.

### THE TRIAL COURT SHOULD HAVE GRANTED THE ANTI-SLAPP MOTION.

Because Overhill failed to make a prima facie showing defendants made a provably false assertion of fact, Overhill failed to show a probability of prevailing on its defamation claim. I do not condone the tone or content of the publications at issue in this case. The issue in this case is whether Overhill produced evidence defendants made a provably false assertion of fact and, for the reasons discussed *ante*, I disagree with the majority and conclude Overhill did not.

The merit of Overhill's claims for intentional interference with prospective economic advantage, intentional interference with contractual relations, and extortion rise or fall on the merit of its defamation claim because all of these

claims were based on wrongful conduct in the form of defendants' making allegedly defamatory statements. I therefore do not need to address those claims separately as they should fall with the claim of defamation.

For all these reasons, the trial court should have granted the motion to strike in its entirety and the order should be reversed.

Appellants' petition for review by the Supreme Court was denied March 2, 2011, S189293. Werdegar, J., was of the opinion that the petition should be granted.