Filed 8/18/20  Tran v. Eat Club CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CYNTHIA KIM TRAN, | H046773 |
| Cross-defendant and Respondent, | (Santa Clara County Super. Ct. No. 18CV332082) |
| v. | |
| EAT CLUB, INC., | |
| Cross-complainant and Appellant. | |

Eat Club, Inc. (Eat Club) appeals from the trial court's March 8, 2018 order granting Cynthia Kim Tran's special motion to strike (anti-SLAPP motion) as to the first cause of action of Eat Club's cross-complaint pursuant to Code of Civil Procedure section 425.16, commonly known as the anti-SLAPP statute.[1]  (See §§ 904.1, subd. (a)(13), 425.16, subd. (i); *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 880 (*Wilson*).)  In its order, the trial court denied Tran's anti-SLAPP motion as to the cross-complaint's third through sixth causes of action because she failed to show that those claims arose from activity that was protected by the anti-SLAPP statute.  Eat Club also challenges the attendant award of $8,310 in attorney fees and costs, which was made pursuant to section 425.16, subdivision (c)(1).  (See *Baharian-Mehr v. Smith* (2010) 189 Cal.App.4th 265, 273-275.)

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise provided.  "SLAPP is an acronym for 'strategic lawsuit against public participation.' [Citation.]" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 815, fn. 1.)

We conclude that Tran's anti-SLAPP motion was properly granted as to the first cause of action for "civil extortion" of Eat Club's cross-complaint and that the trial court did not abuse its discretion in awarding attorney fees and costs. Accordingly, we affirm the March 8, 2018 order.[2]

I

*Procedural History*

*Complaint*

On July 20, 2018, Tran and Rosy Picasso, who were former human resources employees of Eat Club, filed a complaint against Eat Club. It alleged eight causes of action: (1) sexual discrimination in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.); (2) race discrimination in violation of FEHA; (3) retaliation in violation of FEHA; (4) failure to take steps to prevent and correct harassment, discrimination, and retaliation in violation of FEHA; (5) violation of California's amended Equal Pay Act (Labor Code, §§ 1197.5, 1194.5); (6) retaliation in violation of Labor Code section 1102.5 (whistle-blower retaliation); (7) wrongful termination in violation of public policy; and (8) unlawful business practices (Bus. & Prof. Code, § 17200, et seq.).

The complaint described Eat Club as "a provider of corporate catering services," which it offered "to various clients throughout California . . . ." It also alleged the following facts. Tran, a 47-year-old woman, was "the Chief People Officer (CPO) (aka the Head of Human Resources) for Defendant Eat Club." "She was employed from December 18, 2017 to June 1, 2018[,] when she was terminated in response to and in retaliation for her continued reporting of what she reasonably believed to be the

---

[2] This court granted Eat Club's request for a temporary stay, staying "[e]nforcement of the trial court's March 8, 2019 order. . . pending further order of this court." We also deferred ruling on the petition for writ of supersedeas until disposition of the appeal. We address the stay order and pending petition in the disposition.

2

[c]ompany's illegal actions in violation of state and federal labor laws to the [c]ompany's executives and [its] CFO [Chief Financial Officer]." Picasso, a bilingual, 38-year-old Latina of Mexican descent, was Eat Club's Senior Human Resources Specialist and reported directly to Tran. "Picasso was employed from January 17, 2017 (as [a] contractor), then on February 15, 2017 (as [a] full-time employee) to June 15, 2018[,] when she was constructively terminated in response to sex/race discrimination, equal pay act violations, and on going [*sic*] retaliation for her attempts to report what she reasonably believed to be the [c]ompany's illegal actions in violation of state and federal law to the [c]ompany and [its] CFO."

*Eat Club's Cross Complaint Against Tran*

On August 28, 2018, Eat Club filed a cross-complaint for damages against Tran. It alleged six causes of action: (1) civil extortion (Pen. Code §§ 518, 524); (2) conversion; (3) intentional interference with prospective economic advantage; (4) negligent interference with prospective economic advantage; (5) breach of contract; and (6) unfair competition (Bus. & Prof. Code, § 17200, et seq.).

With respect to the first cause of action for civil extortion, the cross-complaint alleged the following facts. On May 31, 2018, Tran threatened Eat Club that "she would provide false testimony in a future class action – solicited by counsel, and to be brought by former employees – unless the company laid her off and met her severance demands." Tran told Eat Club's CFO that "two attorneys contacted her and spoke to her several times" and that "[t]hey planned to sue [Eat Club] for unidentified alleged labor, health, or safety violations at the San Francisco, Sunnyvale, and San Leandro locations." Tran "said that the attorneys promised a 'positive financial outcome' if she testified for them." Tran also told the CFO that "she did not want to 'lie' (for them), so [Eat Club] should pay her a severance and enter into a release agreement to buy the truth."

The cross-complaint further alleged with respect to the civil extortion cause of action the following: "[Tran] implied that she would lie under oath for the benefit of the

3

adverse attorneys, provide dirt on the company for the benefit of adverse attorneys, and disclose the company's privileged attorney client communications unless [Eat Club] paid her a higher amount in severance . . . sufficient to buy her truthful testimony. In doing so, [Tran] attempted to obtain money with an express and implied threat to do unlawful acts (offering false testimony and breaching statutory duties to the company) unless [Eat Club] paid a severance amount greater than the 'positive financial outcome' [that] she expected from the adverse attorneys. After [Eat Club] terminated [Tran's] employment, [Tran] embarked on a series of retaliatory actions for the purpose of further coercing [Eat Club] to meet her extortionate demands and to buy her truthful testimony."

The cross-complaint alleged that "[a]s a direct and proximate result of [Tran's] extortion, [Eat Club] ha[d] been damaged in an amount that ha[d] not been fully ascertained and [would] be proven at trial." It also averred that Tran's acts "were willful, oppressive, fraudulent and/or malicious," and consequently Eat Club was entitled to exemplary damages pursuant to Civil Code section 3294, "in an amount to be ascertained at the time of trial."

*Anti-SLAPP Motion*

Tran filed an anti-SLAPP motion for an order striking and dismissing with prejudice the first, third, fourth, fifth, and sixth causes of action of Eat Club's cross-complaint and an award of attorney fees and costs in the total amount of $24,760.

II

*Evidence Relevant to the First Cause of Action for "Civil Extortion"*

In her declaration, Tran indicated that Eat Club hired her as the "Chief People Officer," and she began working on December 18, 2017. She worked with Eat Club's then president "on a 100 day [*sic*] objective to assess current HR and Payroll practices, create an Employee Handbook, overhaul work conditions and work safety, identify problems and come up with suggested fixes, revamp the benefits program, create perk programs, build out a performance review model and compensation plan to fairly

4

recognize high performers and critical employees, create seamless onboarding and off boarding processes for all relevant departments (including IT, Operations, HR, Staffing, Payroll, Finance, Engineering) and assess Eat Club cultural needs."

Another employee, N.L., stated in her declaration that she was employed by Eat Club from approximately February 20, 2018 to October 3, 2018. N.L. stated that until June 2018, she was employed as Eat Club's "HR Director" and worked with Tran.

In her declaration, N.L. further stated: "In early 2018, in response to reports by Eat Club employees that they were not being paid correctly, Tran directed me to conduct an audit into Eat Club's ADP system. Working with [a] Payroll Specialist . . . , I discovered that Eat Club had been systematically failing to pay Delivery Drivers and Food Preparers wages owed, in violation of California labor law, for years. The payroll records showed, among other things, that Eat Club was not paying the employees a premium overtime rate for hours worked over 8 hours a day or 40 hours a week, but instead paid them only their regular rate for these hours. Additionally, Eat Club failed to provide the employees meal and rest periods. Instead of paying the employees the premium one hour [*sic*] penalty for failing to provide these missed breaks, Eat Club . . . improperly tack[ed] on 30 minutes of additional time onto these employees' time records." (Emphasis omitted.)

Tran stated in her declaration that from approximately December 18, 2017 through March 2018, she "began to discover numerous issues of Eat Club's noncompliance with state and federal law." The issues included among others "labor violations, [improper] safety and health conditions of Eat Club's Hubs and Commissary, fail[ures] to pay/allow reporting of mileage by Delivery Drivers, [and] incorrect W-2's and benefit reports."

Tran disclosed in her declaration that she discovered "through an HR audit . . . that [Eat Club] had been systematically failing to pay Delivery Drivers and Food Preparers wages owed, in violation of California labor law, for years." She also learned through payroll records that "Eat Club was not paying . . . a premium overtime rate for hours

5

worked over 8 hours a day or 40 hours a week." In addition, Tran discovered that Eat Club was failing to provide "meal and rest periods" and not "paying . . . the premium one-hour penalty for failing to provide these missed breaks required by law." She stated that she reported "compliance issues to [Eat Club's then CEO and then president]" who "suggested [that she] contact CFO Jose Rodriguez to set up a fund to repay the affected employees wages owed [to] them."

According to Tran's declaration, Eat Club's CEO and its president were "terminated after a March 28, 2018 Board Meeting." She was asked to "start reporting to CFO Rodriguez" until a new CEO was found. At an " '[a]ll-[h]ands' [m]eeting" on or around March 30, 2018, Trans discussed the company's numerous violations, including its wage and hour violations.

From March 30, 2018 through April 16, 2018, Trans continued to report Eat Club's legal noncompliance. On April 9, 2018, Tran spoke with CFO Rodriguez, who connected her to Eat Club's lawyer.

In his declaration, CFO Rodriguez stated that he met with Tran in early April of 2018, and they "discussed payroll compliance matters." CFO Rodriguez indicated that by e-mail following the meeting, he "directed her to consult with the company's outside counsel." He further stated that at that time, Tran knew that counsel was "defending the company in a wage action pending in Santa Clara County Superior Court, *Laufer v. Eat Club*, *Inc*., which was awaiting final approval of a classwide settlement."

Tran indicated in her declaration that on April 16, 2018, she "continued to emphasize the importance of Eat Club fixing [its] violations ASAP" when she communicated with CFO Rodriguez and "Eat Club's VP of Logistics."

Tran's declaration summarized that during the period of April 24, 2018 to May 30, 2018, "employees began to threaten imminent litigation against Eat Club due to its continu[ing] failure to fix the labor violations." Tran stated, "On or around April 24, 2018, I received a brief call on my mobile phone from a blocked phone number while

6

traveling in my car." Tran further stated: "The callers identified themselves as representing employees from Eat Club. They indicated they were bringing a lawsuit for wage and other violations by Eat Club and that I would be subpoenaed to testify as a witness in the case. Before I could identify the callers or learn more about why they were calling me, the call cut short as I was going through a tunnel. They did not call me back. At no point in the call did the callers ever offer me financial compensation or request me to be untruthful about anything. I do not know the identity of the callers."

Tran indicated in her declaration that when she communicated with Eat Club's regional director of logistics for Los Angeles in early May of 2018, she discovered that Eat Club was not correctly paying delivery employees for their travel between destination hubs. Tran indicated in her declaration that as of May 3, 2018, there was a new CEO at Eat Club, and Tran informed him of the company's violations.

Tran's declaration and attached exhibits showed that on or around May 7, 2018, North Bay Regional Logistics Director, S.R., had reported that A.R., an Eat Club delivery driver, was "planning to take legal action" against the company because, among other things, she had not been paid for overtime since she had starting working at Eat Club. Eat Club's payroll department determined that A.R.'s claims were meritorious and that she had not received overtime pay owed to her.

Tran stated in a declaration that "[o]n or around May 16, 2018," A.R. sent an e-mail to "management stating that she had discovered that she had additional labor claims, including that her managers had falsified her time records." A.R. had stated in her e-mail that she "felt retaliated against for reporting Eat Club's labor violations" and that "she was therefore resigning." Her e-mail indicated that she was seeking "outside counsel." N.L. similarly stated in her declaration: "On or around May 16, 2018," A.R. e-mailed "several managers, including [N.L.], tendering her resignation." The employee's e-mail "detailed new wage violation allegations, including that her time

records had been doctored to falsely represent that she had taken lunch breaks when she in fact did not do so."

N.L. indicated in her declaration that in response to A.R.'s e-mail, she had spoken with S.R. He confirmed that A.R. "had not received her lunch breaks for virtually the entirety of her eight month[s] [of her] employment with Eat Club" and indicated that she was "threatening to sue the company over these matters." "[O]n or around May 23, 2018," N.L. copied Tran on her e-mail to S.R. that recapped her meeting with him.

According to N.L.'s declaration, she informed CFO Rodriguez and an HR consultant of the company's failure to pay A.R. and her threatened lawsuit. N.L. also said "that [they] needed to do further investigation, pay back . . . the wages owed her, and pay back other employees affected by these unlawful practices."

Tran stated in her declaration that on or around May 31, 2018, she "attended a regularly scheduled one-on-one meeting with [CFO Rodriguez]." Tran recalled: "At the outset of the meeting, I informed [CFO Rodriguez] about the call that I had received about the litigation against Eat Club. I told him that if I was [*sic*] subpoenaed to testify in the case, I would not lie to cover up the violations occurring at Eat Club, which would be unethical, but would rather testify truthfully." According to Tran, she told the CFO that "as he knew, . . . employees [were] threatening to sue the [c]ompany [and they] appeared to have legitimate grounds to do so." (Emphasis omitted.) Tran further stated that she "suggested [that] the best thing the [c]ompany could do was fix the problems."

Tran further stated in her declaration: "At no point in this conversation did I make any demand for money, severance payment, or any other form of compensation, either expressly or impliedly, in connection with the call, or the truthful testimony I would give if subpoenaed. At no point did I indicate, either expressly or impliedly, that I would testify untruthfully. Rather, I was simply communicating that I believed I was going to be subpoenaed to testify in imminent litigation; that Eat Club was putting me in a difficult situation by refusing to address the wage and other violations [that] I had

8

brought to its attention[;] and that I would not alter my testimony to favor the company." (Emphasis omitted.)

In her declaration, Tran also explained how the subject of severance had come up at the May 31, 2018 meeting. CFO Rodriguez had "proceeded to tell [her] about a planned Reduction in Force ('RIF') [that] he planned to carry out[,] which would result in the layoff of approximately ten to fifteen employees in June 2018. [Tran] indicated that [she] believed that was the wrong course of action. . . . [Tran] indicated that if necessary [she] would offer [herself for] the RIF to save others' jobs. . . . [The CFO] said that they needed [her] to stay for at least the next 3 to 4 months to [e]ffect all the lay offs [*sic*]." Tran further stated in her declaration: "I indicated that I did not want to do their 'dirty work' and terminate people unnecessarily. . . . He proposed paying me a severance package . . . . The severance proposal was brought up entirely by him, not myself [*sic*]."

In his declaration, CFO Rodriguez stated that on May 31, 2018, he met with Tran to "get [her] HR guidance and insight" for a RIF planned for June 20, 2018. He informed Tran that Eat Club would be offering "severance to the affected employees based on each person's years of service and position," and Tran asked to be included in the RIF. Rodriguez further stated: "[Tran] told me that two attorneys [had] contacted her and spoke[n] to her several times. The attorneys planned to sue Eat Club for alleged labor, health, or safety violations at the San Francisco, Sunnyvale, and San Leandro locations. Tran said the attorneys promised a 'positive financial outcome' if she testified for them. Tran told me that she did not want to 'have to lie', [*sic*] so Eat Club should pay her a severance and enter into a release agreement. Tran claimed to want to contribute the severance money for a charity. I told Tran that lying under oath was against the law; I urged her to tell the truth. I asked Tran for the names of the attorneys and the law firm. She claimed to not know the attorneys' names because they talked fast and their phones had a blocked Caller ID. I asked Tran why she did not simply hang up on the attorneys

9

when they did not disclose their names or phone numbers; Tran did not answer. I viewed Tran's demand on May 31 as extortionate."

Tran was terminated on June 1, 2018 during a meeting with CFO Rodriguez and Eat Club's founder. According to Tran, she was told that she was "not a good 'fit' for the company" and that she was being terminated. She was not told that she "had done anything wrong" or had "acted inappropriately in [the] meeting the day before" and she was not "accuse[d] . . . of extortion." Tran was "handed a Notice of Change In Relationship Form," which indicated that the change was "involuntary termination," but the form did not state a reason for the action. Tran believed that she "was illegally terminated in retaliation for reporting and attempting to correct [Eat Club's] illegal actions."

According to CFO Rodriguez, during the June 1, 2018 "exit" meeting, he offered Tran "the same severance as others included in the RIF based on tenure and position." But Tran "scoffed at the severance" and told him that he would hear from her attorney. Rodriguez stated in his declaration that he "asked Tran to return her company-owned laptop and security badge" and that Tran said that the laptop was at home and that she would return it "to a colleague, [N.L.], over the weekend." According to Rodriguez, "Tran did not return the company's laptop computer."

Tran's and N.L.'s declarations indicated that the following day, June 2, 2018, the new CEO sent out an e-mail to staff that read, "Team, [¶] I wanted to let you all know that, at my request, Kim Tran's employment with EAT Club ended yesterday. In thinking through where we need to go as an organization, from a cultural, business and strategic perspective, it became clear to me that we needed a new HR leader."

Tran's declaration and an attached exhibit indicate that on or around June 1, 2018, Tran sent an e-mail to A.R., at that point a former employee of Eat Club, seeking to discuss litigation against Eat Club. Tran sought legal counsel to help her bring a wrongful termination lawsuit against Eat Club, and she "also reached out, on [her] own

initiative, to other former employees . . . who had expressed . . . interest in bringing legal claims against Eat Club, or who had reported or experienced violations during their employment at Eat Club, to discuss civil litigation against Eat Club." She contacted the law firm of Da Vega Fisher Mechtenberg LLP (DFM)—the law firm that represented her below and represents her in this appeal—for the first time on or around June 5, 2018.

A June 14, 2018 letter to Tran from counsel for Eat Club stated in part: "More specifically, on May 31, 2018, [CFO Rodriguez] spoke to you about a contemplated small reduction in force at Eat Club. He expressly stated that the information was highly confidential and that only three executives were aware of the potential RIF. He further explained that, because you were Eat Club's HR executive, he would need your help in implementing the potential RIF. [¶] In response, you asked to be a part of the RIF, stated that you had been repeatedly contacted by attorneys seeking testimony and 'dirt' on the company, that those attorneys had suggested you could receive a financial benefit for this testimony. You told Rodriguez that you didn't want to 'lie,' and that if Eat Club paid you a severance (which you stated you would give to charity), you would not be able to testify due to the release agreement. Rodriguez responded that under no circumstances should you lie as it is against the law. He further stated that he failed to see how your signing an [*sic*] release agreement would prevent you from testifying. [¶] Your May 31, 2018 communication to Rodriguez constitutes extortion." Tran indicated in her declaration that this was the first time that she was accused of extortion.

N.L. indicated in her declaration that after Tran was terminated, she took over Tran's job duties until she was terminated in early October of 2018. N.L. further stated: "Like Tran, I pressed the CFO to finish the investigation into Eat Club's wage violations and repay the affected employees, with no success. The wage and hour class action complaint in *Fregoso v. Eat Club*, Santa Clara Superior Court Case No. 18CV330433 was filed on or around June 21, 2018. When the complaint was brought to my attention,

I told CFO Rodriguez that, based on my experience, the allegations appeared to be meritorious and needed to be addressed."  (Emphasis omitted.)

III

*Trial Court's Ruling on Anti-SLAPP Motion*

The trial court denied Tran's request to take judicial notice of court records from two other cases, *Fregoso et al. v. Eat Club* and another action that Eat Club had settled.

As to the cross-complaint's cause of action for civil extortion, the trial court determined that "the narrow *Flatley* exception"—for assertedly protected activity that was illegal as a matter of law—did *not* apply and prevent Tran from invoking the anti-SLAPP statute.  (See *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*).)  It concluded that Tran had carried her initial burden of showing that the cause of action arose from activity protected by the anti-SLAPP statute.  The court explained: "Statements made in anticipation of litigation, including statements about contemplated testimony qualify as statements made in connection with a judicial proceeding. [Citations.]  Accordingly, Tran's statements about her contemplated testimony qualify as statements made in connection with a judicial proceeding within the meaning of . . . section 425.16, subdivision (e)."

For purposes of the second step of the anti-SLAPP analysis, the court accepted as true evidence that Tran had threatened to falsely impute unlawful or disgraceful conduct to Eat Club and had demanded severance pay.  But the court found that "Eat Club's prima facie showing [of merit fell] short because it never actually gave Tran anything in light of her [asserted] demand.  [Citation.]"  It observed that Eat Club had not identified "any evidence . . . that it [had given] Tran severance or any other payment as a result of her threat" and had not shown that it had suffered any damages or "actually lost anything as a result of Tran's demand."  It commented that Tran's allegedly retaliatory conduct was "not a payment made to her."

12

In addition, the trial court stated that Eat Club had cited "no authority establishing [that] Penal Code section 524 gives rise to a private right of action for attempted extortion" and that it had not "located any authority establishing the existence of a corresponding civil claim for attempted extortion (fn. omitted)." It concluded that Eat Club had not "demonstrate[d] [that] the first cause of action [was] a legally sufficient claim for attempted extortion." It found it unnecessary to reach the question whether "Eat Club's claim lack[ed] merit for the additional reason that it [was] barred by the litigation privilege." The court struck "[t]he first cause of action [for civil extortion], consisting of paragraphs 18 through 21 of the cross-complaint."

As to the third through sixth causes of action of Eat-Club's cross-complaint, the trial court concluded that Tran had not carried her initial burden of demonstrating that those causes of action arose from activity that was protected by the anti-SLAPP statute. The court denied the anti-SLAPP motion as to those claims.

The order awarded $8,310 in attorney fees and costs to Tran.

IV

*Discussion*

A. *Anti-SLAPP Motion*

1. *Introduction*

Under section 425.16, "[a] cause of action against a person *arising from* any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is *a probability that the plaintiff* [*or cross-complainant*] *will prevail on the claim*." (§ 425.16, subd. (b)(1), italics added; see § 425.16, subd. (h).) "The anti-SLAPP statute, itself, treats complaints identically with cross-complaints. (§ 425.16, subd. (h).)" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) If a pleaded cause of action alleges both protected and unprotected activity—a so-called "mixed cause of

13

action"—"the proper subject" of anti-SLAPP motion is only the claim "based on the conduct protected by the statute." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 382 (*Baral*).)

"The procedure made available . . . by the anti-SLAPP statute has a distinctive two-part structure. [Citations.] A court may strike a cause of action only if the cause of action (1) arises from an act in furtherance of the right of petition or free speech 'in connection with a public issue,' and (2) the plaintiff [or cross-complainant] has not established 'a probability' of prevailing on the claim. [Citation.]" (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619-620 (*Rand Resources*).) " 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 278-279 (*Soukup*).)

We independently review the trial court's order granting an anti-SLAPP motion under section 425.16. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055 (*Rusheen*).) In conducting a de novo review, this court, like the trial court, considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2); see *Flatley*, *supra*, 39 Cal.4th at p. 326).) We do not weigh credibility or compare the weight of the evidence. (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.)

2. *First Step: Protected Activity*

a. *Governing Law*

"A defendant [or cross-defendant] satisfies the first step of [anti-SLAPP] analysis by demonstrating that the 'conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16]' [citation], and that the plaintiff's claims in fact *arise* from that conduct [citation]." (*Rand Resources*, *supra*, 6 Cal.5th at p. 620; see 425.16, subd. (h).) For purposes of the anti-SLAPP statute, the phrase "'act in furtherance of a person's right of petition or free

14

speech under the United States or California Constitution in connection with a public issue' includes . . . any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(2).) By statutory mandate, courts must construe this language broadly. (§ 425.16, subd. (a).) "[A] defendant [or cross-defendant] need only make a prima facie showing that the underlying activity falls within the ambit of the statute." (*Flatley*, *supra*, 39 Cal.4th at p. 317; see 425.16, subd. (h).)

A "defendant's [or cross-defendant's] initial burden in invoking the anti-SLAPP statute is to make ' "a threshold showing that the challenged cause of action [or claim] is one arising from protected activity." ' [Citation.]" (*Soukup*, *supra*, 39 Cal.4th at p. 286; see 425.16, subd. (h).) "There is no further requirement that the defendant [or cross-defendant] initially demonstrate his or her exercise of constitutional rights of speech or petition was valid as a matter of law. [Citation.]" (*Soukup*, *supra*, at p. 286.) "Once that burden is met, the burden shifts to the opposing party to demonstrate the 'probability that the plaintiff [or the cross-complainant] will prevail on the claim.' [Citations.]" (*Zamos v*. *Stroud* (2004) 32 Cal.4th 958, 965; see 425.16, subd. (h).)

"At the first step, the moving defendant [or cross-defendant] bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them. When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at this stage. If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached." (*Baral*, *supra*, 1 Cal.5th at p. 396; see 425.16, subd. (h).)

Generally, in step one "a defendant [or cross-defendant] is not required to establish that its actions are constitutionally protected as a matter of law because such a requirement would render the second prong of the anti-SLAPP statute ' "superfluous." ' [Citation.]" (*Flatley*, *supra*, 39 Cal.4th at p. 319; see 425.16, subd. (h).) *Flatley*

15

established, however, that "section 425.16 cannot be invoked by a defendant [or cross-defendant] whose assertedly protected activity is illegal as a matter of law and, for that reason, not protected by constitutional guarantees of free speech and petition." (*Flatley*, *supra*, at p. 317; see 425.16, subd. (h).) Accordingly, where a defendant or cross-defendant who has filed an anti-SLAPP motion "concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law, the defendant [or cross-defendant] is precluded from using the anti-SLAPP statute to strike the plaintiff's [or cross-complainant's] action." (*Flatley*, *supra*, at p. 320; see *id.* at pp. 305 [the defendant's communications constituted criminal extortion as a matter of law].) "If, however, a factual dispute exists about the legitimacy of the defendant's [or cross-defendant's] conduct, it cannot be resolved within the first step but must be raised by the plaintiff [or cross-complainant] in connection with the plaintiff's [or the cross-complainant's] burden to show a probability of prevailing on the merits." (*Id.* at p. 316.)

In addition, a plaintiff's or cross-complainant's "allegations cannot be dispositive of the question" "whether an act qualifies as protected activity under the anti-SLAPP statute." (*Wilson*, *supra*, 7 Cal.5th at p. 889.) "[T]here is an important difference between permitting the defendant [or cross-defendant] to present evidence of its own motives in an effort to make out its prima facie case of protected activity and treating a plaintiff's [or a cross-complainant's] allegations of illicit motive as a bar to anti-SLAPP protection." (*Ibid.*)

b. *Challenged Evidence*

Eat Club filed numerous written objections to, and moved to strike, statements contained in the declarations of Tran and N.L. Eat Club asserts that the trial court abused its discretion by overruling its objections.[3]

---

[3] Eat Club's general claim that the trial court abused its discretion by admitting evidence over its objections is deemed forfeited on appeal insofar as Eat Club now fails

16

Eat Club objected to Tran's statements in her declaration concerning the phone call on or about April 24, 2018 (the April phone call) on the grounds of hearsay and lack of foundation. It also objected to Tran's statement as to threats of imminent litigation by employees on the grounds that it was hearsay, lacked foundation, and stated "conclusory opinions." We conclude that the trial court properly overruled those specific objections.

It may be inferred from Tran's statement concerning the April phone call that she personally heard what the callers were saying to her and that her statement as to the content of that conversation was based on personal knowledge. (See Evid. Code, § 702; see also Evid. Code, § 170.) In any case, Eat Club's general lack-of-foundation objections did not preserve any specific foundational objection for appellate review. (*People v. Porter* (1947) 82 Cal.App.2d 585, 588.)

"It does not necessarily follow that the bare statement, 'no proper foundation laid,' or 'the proper foundation has not been laid,' is specific and sufficient to raise any failure to establish the conditions for admissibility of evidence conditionally admissible. The various foundation requirements are so dissimilar that such statements are, in some instances, no more informative than the general objection. [Citation.]" (3 Witkin, Cal. Evid. (5th ed. 2012) Objection of No Foundation Laid, § 392; see Evid. Code, § 353, subd. (a) [an evidentiary objection must "make clear the specific ground of the objection"].) To preserve an objection of lack of foundation for appellate review, the objection must specifically state the foundational defect. (See *Bank of America v. Taliaferro* (1956) 144 Cal.App.2d 578, 582; *People v. Modell* (1956) 143 Cal.App.2d 724, 729.) Contrary to Eat Club's suggestion, trial courts are not required to scrutinize a party's declarations for foundational deficiencies. (See *Gallagher v. Connell* (2004) 123

to identify specific evidence and specific evidentiary objections thereto raised below and fails to present legal argument and authorities to demonstrate the validity of those specific objections. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793; Cal. Rules of Court, rule 8.204(a)(1)(B).)

Cal.App.4th 1260, 1268-1269 [rejecting an argument that "a court, in ruling on a SLAPP motion, should determine the admissibility of the plaintiff's proffered evidence if the defendant at least raises the issue of admissibility even if he or she has not composed a technically sufficient objection"].)

Eat Club contends that "the conclusory statements of unidentified employees [was] double hearsay for purposes of proving the truth of the matters asserted." "Although affidavits and declarations constitute hearsay when offered for the truth of their content, section 425.16, subdivision (b)(2) permits their consideration in ruling on a pretrial anti-SLAPP motion." (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 942 (*Sweetwater*).)

Further, "an out-of-court statement can be admitted for the nonhearsay purpose of showing that it imparted certain information to the hearer, and that the hearer, believing such information to be true, acted in conformity with such belief. [Citation.]" (*People v. Montes* (2014) 58 Cal.4th 809, 863; see Evid. Code, § 1200 [hearsay rule].) Tran made statements concerning (1) the content of the April phone call—in which unknown callers claiming to represent Eat Club employees informed her that they were bringing a lawsuit against the company for its wage and other violations and that she would be subpoenaed to testify as a witness in that case; (2) her understanding that Eat Club had been engaging in systemic Labor Code and other violations; and (3) her awareness that, during the period of April 24, 2018 to May 30, 2018, employees were threatening imminent litigation against Eat Club due to such violations. Those statements were relevant and admissible for nonhearsay purposes. (See Evid. Code, §§ 210, 1200, subd. (a).) They were relevant to show that when Tran discussed the litigation that was the subject of the April phone call with CFO Rodriguez on May 31, 2018, Tran anticipated in good faith being subpoenaed as a witness in a lawsuit being brought by other employees against Eat Club—which suit was being seriously contemplated in good faith, if not already underway. The trial court did not abuse its discretion by overruling Eat Club's

18

"conclusory opinions" objection to Tran's statement regarding threatened employee litigation.

Eat Club has failed to demonstrate that the trial court erred in overruling evidentiary objections to Tran's statements about the April phone call and her awareness of threatened employee litigation.

c. *Tran Made a Prima Facie Showing at Step One*

On appeal, Eat Club acknowledges that the protection of the anti-SLAPP statute is available for prelitigation communications. Nevertheless, the company contends that "no portion of Tran's extortionate demand could qualify as pre-litigation communications [because] no litigation existed or was seriously contemplated in good faith at the time." It claims that "no litigation was contemplated [by Tran] until after her termination – and certainly not at the time of her meeting with [the] CFO . . . on May 31, 2018." Eat Club is not arguing on appeal that Tran's assertedly "extortionate demand" was illegal as matter of law and, therefore, was outside the purview of the anti-SLAPP statute under *Flatley*.

According to Eat Club, after Tran was informed of the company's upcoming RIF, she told its CFO that "two attorneys planned to sue Eat Club for alleged labor, health, or safety violations." Eat Club asserts that Tran's claim that her statements were made in anticipation of litigation contemplated in good faith and under serious consideration was unfounded since she did not identify the attorneys, their clients, or their claims. It maintains that Tran was "merely engaged in underhanded bargaining tactics to extort money and quit."

Even though the litigation privilege (see Civ. Code, § 47, subd. (b)), which " 'bars all tort causes of action except a claim of malicious prosecution[]' [citation]" (*Flatley*, *supra*, 39 Cal.4th at p. 322), and the anti-SLAPP statute "serve quite different purposes" (*ibid.*), courts "have looked to the litigation privilege as an aid in construing the scope of section 425.16, subdivision (e)(1) and (2) with respect to the first step of the two-step

anti-SLAPP inquiry." (*Id*. at pp. 322-323.) The litigation privilege is "not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards. [Citation.]" (*Rusheen*, *supra*, 37 Cal.4th at p. 1057.)

"The principal purpose of [the litigation privilege] is to afford litigants *and witnesses* [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.]" (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 213 (*Silberg*), italics added.) As a matter of public policy, "witnesses should be free from the fear of protracted and costly lawsuits which otherwise might cause them either to distort their testimony or refuse to testify altogether. [Citations.]" (*Id*. at p. 214.) Thus, the litigation privilege protects witnesses as well as parties to litigation. (*Id*. at pp. 213-214; see *Kachig v. Boothe* (1971) 22 Cal.App.3d 626, 641.)

Since the litigation privilege "protects any statements or writings that have ' "some relation' " to a lawsuit, communications made both during and in anticipation of litigation are covered . . . . [Citations.]" (*Kenne v. Stennis* (2014) 230 Cal.App.4th 953, 965.) Thus, the privilege "encompasses not only testimony in court and statements made in pleadings, but also statements made prior to the filing of a lawsuit, whether in preparation for anticipated litigation or to investigate the feasibility of filing a lawsuit. [Citation.]" (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 361.) The privilege applies to " ' "preliminary conversations and interviews related to contemplated action[.]" ' " (*Ibid*.)

"To be protected by the litigation privilege, a communication must be 'in furtherance of the objects of the litigation.' (*Silberg*, *supra*, 50 Cal.3d at p. 219.) This is 'part of the requirement that the communication be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the action.' (*Id*. at pp. 219-220.) A prelitigation communication is privileged only when it relates to litigation that is

20

contemplated in good faith and under serious consideration. [Citations.]"**4** (*Action Apartment*, *supra*, 41 Cal.4th at p. 1251.)

With respect to anti-SLAPP motions, courts have concluded that " 'communications preparatory to or in anticipation of the bringing of an action or other official proceeding' " are protected by section 425.16. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115; see *Flatley*, *supra*, 39 Cal.4th at p. 322, fn. 11.) "Both section 425.16 and Civil Code section 47 are construed broadly, to protect the right of litigants [and witnesses] to ' "the utmost freedom of access to the courts without [the] fear of being harassed subsequently by derivative tort actions." ' [Citations.]" (*Healy v. Tuscany Hills Landscape & Recreation Corp.* (2006) 137 Cal.App.4th 1, 5; see § 425.16, subd. (a).)

Although Tran did not have a basis to sue for wrongful termination until Eat Club terminated her on June 1, 2018, Eat Club's asserted civil extortion claim was explicitly based on Tran's May 31, 2018 communications with Eat Club's CFO regarding her prospective role as a witness in employee litigation against Eat Club. The evidence of Tran's awareness of Eat Club's systemic wage and other violations against employees prior to May 31, 2018—together with the evidence of her knowledge of a pending wage class action against Eat Club (*Laufer v. Eat Club*, *Inc.*), the April phone call that she received, and her knowledge about A.R.'s threatened lawsuit against Eat Club—tended to support a good faith belief on her part that (1) the litigation that was the subject of the April phone call was already underway, or at least under serious contemplation in good faith, and (2) she would be subpoenaed as a witness in that employee litigation against

---

**4** " 'It is important to distinguish between the lack of a good faith intention to bring a suit and publications which are made without a good faith belief in their truth, i.e., malicious publications. The latter, when made in good faith anticipation of litigation, are protected as part of the price paid for affording litigants the utmost freedom of access to the courts. . . .' [Citations.]" (*Action Apartment Assn.*, *Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251 (*Action Apartment*).)

Eat Club. This evidence was enough to make out a prima facie showing that Tran's May 31, 2018 statements concerning that anticipated litigation and her potential testimony were prelitigation communications that fell within the ambit of the anti-SLAPP statute. (See *Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1268.)

"At this stage, the question is only whether a [cross-defendant] has made out a prima facie case that activity underlying a [cross-complainant's] claims is statutorily protected [citations]." (*Wilson*, *supra*, 7 Cal.5th at p. 888.) Accordingly, the burden shifted to Eat Club to show a probability of prevailing on the merits of its claim of civil extortion in step two. (See *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 420 (*City of Montebello*); *Baral*, *supra*, 1 Cal.5th at p. 384.)

3. *Second Step*: *Probability of Prevailing*

a. *Introduction*

On an anti-SLAPP motion directed against a claim raised in a cross-complaint, a cross-complainant's "second-step burden is a limited one." (*Wilson*, *supra*, 7 Cal.5th at p. 891.) The cross-complainant is merely required to demonstrate that a challenged claim has at least "minimal merit." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89, 94.) "At this stage, ' "[t]he court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the [cross-complainant] has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the [cross-complainant's] evidence as true, and evaluates the [cross-defendant's] showing only to determine if it defeats the [cross-complainant's] claim as a matter of law." ' [Citations.]" (*Wilson*, *supra*, at p. 891; see *Baral*, *supra*, 1 Cal.5th at p. 396.) At this step, a cross-complainant "seeking to demonstrate the merit of the claim 'may not rely solely on its [cross-complaint], even if verified; instead, its proof must be made upon competent admissible evidence.' [Citations.]" (*Sweetwater*, *supra*, 6 Cal.5th at p. 940.)

We see at least three problems with Eat Club's second-step showing. First, *Flatley's* narrow exclusion of communications that "constituted criminal extortion as a

22

matter of law" from the protection of the anti-SLAPP statute (*Flatley*, *supra*, 39 Cal.4th at pp. 305) is irrelevant at the second step. Second, California has not recognized a tort of civil extortion corresponding to criminal extortion.[5] Third, Eat Club fails to demonstrate a probability of prevailing on the merits of its civil extortion cause of action predicated upon Tran's assertedly extortionate communications on May 31, 2018.

b. *Flatley does not Apply in Second Step*

As we indicated, in *Flatley*, "[the California Supreme Court] made it clear . . . that conduct must be illegal *as a matter of law* to defeat a defendant's showing of protected activity. The defendant must concede the point, or the evidence conclusively demonstrate it, for a claim of illegality to defeat an anti-SLAPP motion at the first step. (*Flatley*, *supra*, 39 Cal.4th at pp. 316-318.)" (*City of Montebello*, *supra*, 1 Cal.5th at p. 424.) "If . . . a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits [at the second step]." (*Flatley*, *supra*, at p. 316.)

On appeal, Eat Club complains that the trial court disregarded *Flatley* "for purposes of evaluating the *merits* of the civil extortion cause." Eat Club argues that after

---

[5] Penal Code section 518, subdivision (a), defines criminal extortion in part as "the obtaining of property or other consideration from another, with his or her *consent* . . . induced by a wrongful use of force or fear." (Italics added.) "Fear, such as will constitute extortion, may be induced by a threat of any of the following: [¶] 1. To do an unlawful injury to the person or property of the individual threatened or of a third person. [¶] 2. To accuse the individual threatened, or a relative of his or her, or a member of his or her family, of a crime. [¶] 3. To expose, or to impute to him, her, or them a deformity, disgrace, or crime. [¶] 4. To expose a secret affecting him, her, or them. [¶] 5. To report his, her, or their immigration status or suspected immigration status." (Pen. Code, § 519.) "Every person who attempts, by means of any threat, such as is specified in [s]ection 519 of [the Penal Code], to extort property or other consideration from another is punishable by imprisonment in the county jail not longer than one year or in the state prison or by fine not exceeding ten thousand dollars ($10,000), or by both such fine and imprisonment." (Pen. Code, § 524.)

23

the *Flatley* decision, "several appellate courts ruled on factual scenarios which [they held] constituted extortion as a matter of law, including *Stenehjem v. Sareen.*" (See *Stenehjem v. Sareen* (2014) 226 Cal.App.4th 1405 (*Stenehjem*).)  Eat Club claims that *Stenehjem* is "binding precedent," which establishes that the trial court "erred on its merits analysis."  Eat Club asserts that "Tran's conduct tracked [the facts of] *Stenehjem*" and therefore it sustained its burden to show that the civil extortion cause of action had the requisite "minimal merit" to avoid dismissal.

Eat Club is conflating *Flatley*'s principle that the anti-SLAPP statute does not apply to speech and petitioning activity that is illegal as a matter of law—which applies to threatening communications that constitute criminal extortion as a matter of law—with the entirely separate question of whether California recognizes a civil extortion cause of action for damages.  *Stenehjem* does not discuss whether California recognizes an action for civil extortion or the elements of any such action.  Rather, it held that an e-mail in which a former employee accused a company's chief executive officer of misconduct and threatened to file a qui tam action constituted *criminal* extortion as a matter of law and was not protected by the anti-SLAPP statute.  (*Stenehjem*, *supra*, 226 Cal.App.4th at pp. 1409-1410, 1425, 1427.)  Unlike this case, the facts in *Stenehjem* were undisputed (*id*. at p. 1421, fn. 13), and the appellate court never reached the question of whether the cross-complainant had established a probability of prevailing on his asserted claim for civil extortion.  (See *id*. at p. 1427, fn. 19.)

In contrast to *Flatley* and *Stenehjem*, the circumstances of the assertedly protected communications between Tran and Eat Club's CEO were controverted.  Tran did not concede, and the evidence did not conclusively establish, that her assertedly protected speech was criminal extortion as a matter of law.  (See *Flatley*, *supra*, 39 Cal.4th at p. 320.)  Consequently, as already indicated, the burden shifted to Eat Club to demonstrate a probability of prevailing on the merits of its civil extortion cause of action.

c. *Eat Club's Asserted Claim of Attempted Civil Extortion*

Eat Club argues that "attempted extortion" is a "justiciable civil claim," citing *Cross v. Cooper* (2011) 197 Cal.App.4th 357 (*Cross*). Our *Cross* decision does *not* stand for the proposition that there is a tort cause of action for civil extortion that corresponds to *criminal* extortion or attempted extortion, punishable under the Penal Code. (See *ante*, fn. 5.) Contrary to Eat Club's assertion, the plaintiff in *Cross* did *not* sue for "attempted civil extortion." (See *Cross*, *supra*, at p. 365.) *Cross* did *not*, as Eat Club claims, recite the elements of a civil action for "attempted extortion."

In *Cross*, the plaintiff entered a contract for the sale of her house, and "[a]fter the prospective buyers backed out, [the plaintiff] sued [her renters] for interfering with the sale and causing it to fail." (*Cross*, *supra*, 197 Cal.App.4th at p. 364.) "In her complaint, [the plaintiff] asserted causes of action for breach of a residential lease agreement, breach of the implied covenant of good faith in the lease agreement, inducing prospective buyers to breach their purchase contract with [the plaintiff], intentional interference with that purchase contract, and intentional and negligent interference with prospective economic relations." (*Id*. at p. 365.)

In *Cross*, the plaintiff argued in opposition to an anti-SLAPP motion that a renter's alleged "threat to disclose [that a registered sex offender lived nearby] unless she waived rent constituted attempted extortion." (*Cross*, *supra*, 197 Cal.App.4th at p. 368.) "Since attempted extortion is a crime (Pen. Code, § 524), the court concluded that the threat did not qualify for anti-SLAPP protection." (*Id*. at p. 369.) The trial court denied an anti-SLAPP motion as to all causes of action, finding that they did not "qualify for anti-SLAPP protection." (*Ibid*.) Accordingly, the trial court did not reach step two of the anti-SLAPP analysis and "determine whether [the plaintiff] had shown a probability of success on the merits of her claims." (*Ibid*.)

On appeal in *Cross*, this court determined that "the evidence before the trial court did *not* conclusively establish [the crime of] attempted extortion as a matter of law."

25

(*Cross*, *supra*, 197 Cal.App.4th at p. 386, italics added.) We pointed out that "[n]ot only did [a defendant] not concede criminal conduct, but [the case was not] one of those rare cases in which there is uncontroverted and uncontested evidence that establishes the crime as a matter of law. [Citations.]" (*Ibid*.) Consequently, we concluded that the trial court's order denying the anti-SLAPP motion under *Flatley* could not stand. (*Id*. at p. 392.) We reversed the order and remanded the matter for further proceedings. (*Ibid*.)

In *Monex Deposit Co. v. Gilliam* (C.D. Cal. 2009) 666 F.Supp.2d 1135 (*Monex*), another case cited by Eat Club, the defendants moved to dismiss a claim contained in a first amended complaint. (*Id*. at p. 1135.) They contended that the plaintiff failed to state a claim for civil extortion because Monex never paid any money or transferred any property in response to the defendants' threats. (*Id*. at p. 1136.) But Monex had alleged proximately caused damages. (*Id*. at p. 1137.) Thus, the posture of the case in *Monex* was different than in this case. Here, Eat Club was required to make "a prima facie factual showing sufficient to sustain a favorable judgment." (*Baral*, *supra*, 1 Cal.5th at p. 385.)

Citing *Fuhrman v. California Satellite Systems* (1986) 179 Cal.App.3d 408 (*Fuhrman*), disapproved on another ground in *Silberg*, *supra*, 50 Cal.3d at pp. 212-213, 219, the federal district court in *Monex* stated that "California has recognized a civil cause of action for the recovery of money obtained by the wrongful threat of criminal or civil prosecution, whether the claim is denominated as 'extortion, menace, or duress.' " (*Monex*, *supra*, 666 F.Supp.2d at p. 1136.) After quoting the Restatement Second of Torts, section 874A, the district court declined to dismiss Monex's claim for civil extortion "because the civil tort for extortion is derived from the crime of extortion, and because recognizing a claim for civil extortion furthers the purpose of California Penal Code section 523."[6] (*Id*. at p. 1137.)

---

[6] Penal Code section 523, subdivision (a), provides: "Every person who, with intent to extort property or other consideration from another, sends or delivers to any

26

No California state case has relied upon the Restatement Second of Torts, section 874A to recognize a tort action for civil extortion based on criminal extortion under the Penal Code. That Restatement section provides: "When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action." (Cf. *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, 325 [endorsing "the view set out in the Restatement, that courts, exercising their authority over the common law, may, in appropriate circumstances, recognize a tort action for damages to remedy a constitutional violation"], 328 [but declining to recognize a constitutional tort action for damages to remedy the alleged deprivation of a professor's liberty interest in his reputation without due process in violation of the California Constitution].)

In *Fuhrman*, the plaintiff had appealed from "a judgment dismissing her first amended complaint after the court sustained [the] defendants' demurrers without leave to amend." (*Fuhrman*, *supra*, 179 Cal.App.3d at p. 416.) The defendants had sent "two settlement demand letters . . . to plaintiff and several thousand other residents of Sacramento County." (*Ibid*.) As to the plaintiff's extortion cause of action, the defendants contended that " 'extortion' is only a crime and cannot form the basis for a civil action in tort." (*Id*. at p. 426.)

---

person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in [Penal Code] [s]ection 519 is punishable in the same manner as if such property or other consideration were actually obtained by means of such threat." (See *ante*, fn. 5.)

27

The appellate court in *Fuhrman* recognized an action for civil extortion, which it described as "essentially a cause of action for moneys obtained by duress, a form of fraud. [Citation.]" (*Fuhrman*, *supra*, 179 Cal.App.3d at p. 426.) The court stated that "[h]owever denominated (e.g., extortion, menace, duress), our Supreme Court has recognized a cause of action for the recovery of money obtained by the wrongful threat of criminal or civil prosecution. (See *Leeper v. Beltrami* (1959) 53 Cal.2d 195, 203-204; *Woodham v. Allen* (1900) 130 Cal. 194, 198-200.)" (*Ibid.*) In other words, "[a]n action for duress is an action for the recovery of moneys received by a defendant under the influence of duress. [Citations.]" (*Id.* at p. 428.) The appellate court concluded that "[t]he fatal flaw in [the] plaintiff's action [was] that she apparently *never paid* the money [the] defendants demanded in their letters." (*Id.* at p. 426.)

Tran maintains that Eat Club failed to establish a probability of prevailing on its extortion cause of action, in part because it did not present any evidence that Tran's alleged conduct caused any damages. Eat Club attempts to distinguish *Fuhrman*, we conclude unsuccessfully, on the ground that the plaintiff in *Fuhrman* only alleged damages for emotional distress and for attorneys' fees. Eat Club made no showing of actual damages resulting from Tran's purportedly extortive communications on May 31, 2018.

Eat Club insists that case law "tacitly recogniz[es] a private right of action for attempted extortion" and that "attempted civil extortion is a valid cause of action, either at law or equity, under Penal Code section 523." (See *ante*, fn. 6.) Penal Code section 523 makes the crimes of sending threatening letters and introducing ransomware "with intent to extort property or other consideration from another" (Pen. Code, § 523, subds. (a), (b)(1)) punishable "in the same manner as if such property or other consideration were actually obtained by [such] means." (*Ibid.*) Those types of crimes did not occur in this case. We assume that Eat Club meant to cite to Penal Code section 524. (See *ante*, fn. 5.)

28

Aside from *Mendoza v. Hamzeh* (2013) 215 Cal.App.4th 799 (*Mendoza*), Eat Club cites only lower federal decisions in support of its argument that attempted extortion as defined in the Penal Code is a valid civil cause of action in California.[7]  We are not bound by federal decisions on matters of California law.  (See *Haynes v. EMC Mortgage Corp.* (2012) 205 Cal.App.4th 329, 335; *Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 764 ["[D]ecisions of the lower federal courts are not binding precedent [citation], particularly on issues of state law."].)  None of the federal cases cited by Eat Club are persuasive because they do not accurately reflect this state's law.[8]

*Mendoza* was an anti-SLAPP case in which the trial court concluded in step one of its anti-SLAPP analysis that "the communication at issue was not covered by the anti-SLAPP statute based on the holding in *Flatley*, *supra*, 39 Cal.4th 299."  (*Mendoza*, *supra*, 215 Cal.App.4th at p. 803.)  The appellate court agreed that the threat in a "demand

_____

**[7]** The citation of "unpublished *federal* opinions does not violate our [court] rules. (Cal. Rules of Court, rule 8.1115.)"  (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18.)

**[8]** The federal district court opinions mentioned by Eat Club largely cite to other federal district court opinions for the proposition that California recognizes a claim for civil extortion, which is derived from the California Penal Code.  (See *Baker v. FirstCom Music* (C.D. Cal. 2017) 2017 U.S. Dist. LEXIS 222010 at *33-34 (*Baker*); *Calicraft Distributors*, *LLC v. Castro* (C.D. Cal. 2015) 2015 U.S. Dist. LEXIS 51793 at *8, & fn. 3; *Leibman v. Prupes* (C.D. Cal. 2015) 2015 U.S. Dist. LEXIS 25906 at *41, fn. 6 (*Leibman*); *TaiMed Biologics*, *Inc. v. Numoda Corp.* (N.D. Cal. 2011) 2011 U.S. Dist. LEXIS 48863 at *14-17; *Hisamatsu v. Niroula* (N.D. Cal. 2009) 2009 U.S. Dist. LEXIS 115712 at *15-16 (*Hisamatsu*).)  One of these federal district court cases also relied on *Fuhrman*, which did not imply a civil extortion cause of action based on the Penal Code. (See *Hisamatsu*, *supra*, 2009 U.S. Dist. LEXIS 115712 at *15-16.)  Two of these federal cases also cited *Flatley*, or a California case applying *Flatley*.  (See *Baker*, *supra*, 2017 U.S. Dist. LEXIS 222010 at *33; *Leibman*, *supra*, 2015 U.S. Dist. LEXIS 25906 at *41, fn. 6 [citing *Mendoza*, *supra*, 215 Cal.App.4th 799].)  Neither of these California cases addressed whether a civil extortion cause of action for damages exists under California law.  None of these cited cases demonstrate that attempted extortion, as defined in the Penal Code, is a "justiciable civil claim" under this state's law.

letter" "constitute[d] criminal extortion as a matter of law." (*Id*. at p. 807.) Although one of the causes of action asserted by plaintiff Mendoza had been for "civil extortion" (*id*. at p. 802), the appellate court did not "decide whether Mendoza ha[d] demonstrated a probability of prevailing on his causes of action (the second step in the two-step anti-SLAPP analysis)." (*Id*. at p. 807.) This case does not support Eat Club's arguments.

Eat Club also cites *St. Clair v. National Ass'n of Legislative Review* (N.D. Cal. 2001) 2001 U.S. Dist. LEXIS 9438 (*St. Clair*), which stated with respect to a claim of extortion, that "California recognizes a cause of action in tort where a defendant attempts to obtain property by wrongful conduct, such as a threat to institute legal proceedings 'where the defendant [knows] the claim asserted [is] false.' " (2001 U.S. Dist. LEXIS 9438 at *7.) In support, *St. Clair* cited *Leeper*, *supra*, 53 Cal.2d 195 (*Leeper*) and *Fuhrman*. (*St. Clair*, *supra*, 2001 U.S. Dist. LEXIS 9438 at *7-8.) *Fuhrman*, as discussed, viewed such action as one to recover moneys obtained by duress. (*Fuhrman*, *supra*, 179 Cal.App.3d at pp. 426, 428.)

In *Leeper*, the plaintiffs appealed from a judgment entered after the sustaining of the defendants' demurrer without leave to amend. (*Leeper*, *supra*, 53 Cal.2d at p. 200.) The California Supreme Court concluded that the complaint stated a cause of action against two defendants and a separate cause of action against one defendant, both based on economic duress. (*Id*. at pp. 203-206.) The complaint alleged that two "defendants wrongfully, with knowledge of the falsity of the claim, attempted to foreclose on a mortgage which had already been satisfied" (*id*. at p. 203) and that as a result of "the extortionary claim," a plaintiff was compelled to convey another "property for a third of its actual market value" to a third defendant, who had knowledge of that duress. (*Id*. at p. 205.) The plaintiffs sought to recover money allegedly paid under duress and "to recover real property conveyed to another defendant under the same duress." (*Id*. at p. 200.)

The Supreme Court recognized in *Leeper* that under the modern law of duress, duress may "consist of threats to business or property interests. [Citations.]" (*Leeper*, *supra*, 53 Cal.2d at p. 203.) In connection with a statute of limitations issue, the court stated: "[W]hether it be considered a suit for restitution to recover money paid under duress (Restatement of Restitution, §§ 70, 71, *supra*), or an action for money had and received sounding in tort (see *Woodham v. Allen*, 130 Cal. 194, 198), or, simply an action for money damages for the tortious conduct of the defendants resulting in injury to the plaintiffs, the basic nature of the wrongdoing of these defendants is duress." (*Id.* at p. 207.) The court indicated that duress and fraud are "often factually closely interconnected and indistinguishable. [Citation.]" (*Ibid.*) It stated that "[a] person who presses an unfounded claim to obtain money from an innocent party, who finds he must pay because of the circumstances in which he finds himself, is certainly guilty of fraudulent conduct." (*Ibid.*) The court characterized duress as a species of fraud. (*Id.* at pp. 205, 207.)

*Leeper* was relied upon in *CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631 (*CrossTalk*), which involved an appeal from an order sustaining a demurrer without leave to amend to a complaint that alleged, among other things, economic duress. (*Id.* at pp. 635, 639.) In *CrossTalk*, a defendant argued that there was no cause of action for "economic duress." (*Id.* at p. 645.) An appellate court rejected the argument, stating "[T]he Supreme Court has noted a general 'right . . . to be free from acts constituting duress' (*Leeper v. Beltrami* (1959) 53 Cal.2d 195, 202) and the propriety of a 'cause of action for wrongful acts in the nature of duress . . . .' (*Id.* at p. 203.)" (*Ibid.*) However, the appellate court stated that "[t]he 'wrongful act' must be sufficiently coercive to cause a reasonably prudent person to be faced with no reasonable alternative but to 'succumb.' " (*Ibid.*; see *Leeper*, *supra*, at p. 204 ["if the plaintiffs had a reasonable alternative to the parting with the consideration to satisfy the false claim, the payment was not made under duress"], 205 [The test is whether "[a] reasonably prudent

31

person would not take such a course"]; but see Rest.2d Torts, § 871, com. f. [subjective test]**9**.)

The appellate court in *CrossTalk* also noted that "allied theories" were "potentially applicable to the facts alleged," suggesting "the possibility of amendment to state a cause of action for interference with prospective economic advantage." (*CrossTalk*, *supra*, 65 Cal.App.4th at p. 645.) In the end, the court concluded that the trial court erred by sustaining the demurrer without leave to amend, stating in part that the plaintiffs could "easily choose a label other than 'economic duress' for their theory that [the] defendant caused them to lose [a] contract." (*Id.* at p. 649.)

We assume that there is a cause of action for damages based on economic duress,**10** which some litigants have alternatively denominated "civil extortion." But we conclude that actual damages are an essential element of any such cause of action.

The Restatement Second of Torts, section 871, provides: "One who intentionally deprives another of his legally protected property interest or causes injury to the interest is subject to liability to the other if his conduct is generally culpable and not justifiable under the circumstances." This rule "applies when a person uses duress" (Rest.2d Torts,

---

**9** Restatement Second of Torts, section 871, comment f, makes the test for duress subjective: "The test of what act or threat produces the required degree of fear is not entirely objective. The threat need not be one that would put a brave person or even a person of ordinary firmness in fear. Age, sex, mental capacity, the relation of the parties and antecedent circumstances must all be considered. It is therefore not essential that a threat be made under such circumstances that a reasonable person would believe that it will be executed, provided the threatened person believes the other has the means and intends to carry it out. However, in determining whether the fear that is essential for duress did in fact exist in a particular case, the trier of fact can properly consider whether a reasonable person would be put in fear under the circumstances."

**10** Economic duress is an affirmative defense to a contract, a ground for avoidance or rescission of a contract, and a basis for restitution of money paid under duress. (See *Chan v. Lund* (2010) 188 Cal.App.4th 1159, 1174; *CrossTalk*, *supra*, 65 Cal.App.4th at p. 644; *Rich & Whillock, Inc. v. Ashton Development, Inc.* (1984) 157 Cal.App.3d 1154, 1158-1161; *Leeper*, *supra*, 53 Cal.2d at pp. 205-207; CACI No. 333; Rest.2d Contracts, § 175; Rest.3d Restitution & Unjust Enrichment, § 14.)

32

§ 871, com. f), and "the liabilities and remedies are the same as those when [the person's] conduct is fraudulent." (*Ibid.*)

In our view, any separate cause of action for damages based on wrongful threats used to obtain money or property, whether labeled "economic duress" or "civil extortion," is akin to a tort action for deceit based on fraud. (See *Leeper*, *supra*, 53 Cal.2d at pp. 205, 207; Rest.2d Torts, § 871, com f.) Logic dictates that actual damages must be shown since such damages are an essential element of a tort action for deceit. "The elements of fraud, which give rise to the tort action for deceit, are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) justifiable reliance, and (5) *resulting damage*. (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173.)" (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255, italics added.) "[A]ctionable deceit . . . requires damages resulting from reliance on a misrepresentation. (Civ.Code, § 1709.) '[F]raud without damage is not actionable . . . .' [Citation.]" (*Building Permit Consultants, Inc. v. Mazur* (2004) 122 Cal.App.4th 1400, 1415.)

Eat Club cites *Overhill Farms, Inc. v. Lopez* (2010) 190 Cal.App.4th 1248 (*Overhill*), to support its argument that the victim need not "capitulate to the extortionate demand" to make out a civil extortion claim. In *Overhill*, the defendants—a community activist and some employees of the plaintiff—brought an anti-SLAPP motion to strike multiple claims, including a claim of "extortion." (*Id.* at pp. 1251-1252.) The trial court denied the motion as to all but an unfair competition claim. (*Id.* at p. 1252.) The appellate court agreed that the plaintiff had carried its burden of proving a probability of prevailing on the merits of all claims except the unfair competition claim. (*Ibid.*) *Overhill* is distinguishable from this case.

All the plaintiff's claims in *Overhill*, including the extortion claim, were based on the defendants' allegedly defamatory statements. (*Overhill*, *supra*, 190 Cal.App.4th at p. 1252.) The plaintiff "made clear that injunctive relief to prohibit future misconduct

was its primary goal." (*Ibid.*)  The appellate court determined that the evidence was "sufficient to demonstrate that [the] defendants' disclosure of facts underlying the employment termination was materially incomplete and misleading, making their 'racist firing' claim sound far more credible than it actually [was]." (*Id.* at p. 1264.)  As to the plaintiff's extortion claim, the appellate court explicitly rejected the contention that "no extortion claim could be based upon a *continuing threat* by defendants to portray [the plaintiff] as having engaged in a mass employment termination for racist reasons" (*id.* at p. 1269, italics added) and their plan to organize a boycott against the plaintiff.  (*Ibid.*) The court reasoned that a future boycott based on false allegations as to the plaintiff's racist motivations for terminating employees, which apparently had been based upon their use of invalid social security numbers (*id.* at 1251), clearly constituted "future harm." (*Id.* at p. 1270.)  The court concluded that if the threat of a future boycott were "used as a lever to force [the plaintiff] to submit to [the] defendants' demands that terminated employees be rehired, [the threat] would qualify as extortion." (*Ibid.*)

*Overhill* does not reflect that the defendants in that case had argued on appeal that a civil extortion claim for damages requires proof of actual damages.  (See *Overhill*, *supra*, 190 Cal.App.4th at pp. 1269-1270.)  "It is axiomatic that cases are not authority for propositions that are not considered.  [Citation.]" (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043 (*California Building Industry*).)

Eat Club attempts to establish actual damages by asserting that Tran retained her work computer for months after her dismissal and misappropriated privileged attorney-client communications.  First, Eat Club does not suggest that it was induced by Tran's threats to consent to her keeping a company computer or privileged communications. Second, any misappropriation was irrelevant to whether Eat Club carried its burden in step two of the anti-SLAPP analysis.

Anti-SLAPP motions target "only claims that are based on the conduct protected by the [anti-SLAPP] statute." (*Baral*, *supra*, 1 Cal.5th at p. 382.) "When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at [the first] stage [of anti-SLAPP analysis]." (*Id.* at p. 396.) "If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached. There, the burden shifts to the [cross-complainant] to demonstrate that each challenged claim *based on protected activity* is legally sufficient and factually substantiated." (*Ibid.*, italics added.)

Without any citation to authority, Eat Club alternatively declares that "[a]s a matter of law, [it] has no duty to prove *any* damages in an intentional tort action." The company then asserts, citing Civil Code section 3360, that "[e]ven without proof of actual damages, the jury may award nominal damages and impose punitive damages for Tran's malicious act of attempted extortion."

The California Supreme Court long ago explained that nominal damages are " '[a] trifling sum awarded where a breach of duty or an infraction of the plaintiff's right is shown, but no serious loss is proved to have been sustained;' or 'where, from the nature of the case, some injury has been done, the amount of which the proofs fail entirely to show.' " (*Maher v. Wilson* (1903) 139 Cal. 514, 520.) Civil Code section 3360 provides that "[w]hen a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages." (See CACI No. 360.) Eat Club identifies no contractual or other duty that Tran breached when she engaged in assertedly extortive communications regarding her potential witness testimony. Neither has it shown any actual injury resulting therefrom.

In support of its argument, Eat Club also cites *Avina v. Spurlock* (1972) 28 Cal.App.3d 1086 (*Avina*), which involved an appeal upon only the judgment roll in a tenants' action for wrongful eviction and wrongful detention of personal property. (*Id.* at pp. 1087-1088.) *Avina* made the following general observation: "Nominal damages are

35

properly awarded in two circumstances: (1) Where there is no loss or injury to be compensated but where the law still recognizes a technical invasion of a plaintiff's rights or a breach of a defendant's duty; and (2) although there have been real, actual injury and damages suffered by a plaintiff, the extent of plaintiff's injury and damages cannot be determined from the evidence presented. [Citations.]" (*Id*. at p. 1088.) Eat Club has not made any showing that it is entitled to nominal damages based on those principles.

Further, the issue in *Avina* was "whether the trial court erred as a matter of law in awarding $501 as nominal damages." (*Avina*, *supra*, 28 Cal.App.3d at p. 1087.) The court held that $501 exceeded the amount that a court may legally award as nominal damages and modified the judgment to award $1. (*Id*. at pp. 1088-1090.) *Avina* did not hold that in a civil extortion cause of action for damages, nominal damages can be recovered in the absence of actual damages. As stated, "cases are not authority for propositions that are not considered. [Citation.]" (*California Building Industry*, *supra*, 4 Cal.5th at p. 1043.)

"In California, . . . actual damages are an absolute predicate for an award of exemplary or punitive damages. [Citations.] Even nominal damages, which can be used to support an award of punitive damages, require actual injury. [Citation.]" (*Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 147; see Civ. Code, § 3294, subd. (a); see *Fuhrman*, *supra*, 179 Cal.App.3d at p. 428 [in an action for economic duress, punitive damages are not recoverable in the absence of actual damages].) Accordingly, Eat Club failed to establish a probability of prevailing on its claim because it presented no evidence that Tran's supposed threats induced the company to give her money, property, or other consideration or that Eat Club suffered any actual injury or sustained any actual damages. Eat Club failed to carry its burden in step two of the anti-SLAP analysis with respect to the first cause of action for civil extortion.[11]

_____

[11] Like the trial court, we do not resolve whether the litigation privilege defeated Eat Club's civil extortion claim.

36

B. *The Award of Attorney Fees and Costs*

Under section 425.16, subdivision (c)(1), with an exception not here applicable, "a prevailing defendant [or cross-defendant] on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." (See 425.16, subd. (h).) Tran remains the prevailing party as to Eat Club's civil extortion claim. Nevertheless, Eat Club contends that Tran is not entitled to fees and costs because her motion "effectively 'accomplished nothing.' " It argues that the striking of her civil extortion claim did not "advance her litigation posture at all."

In its ruling on Tran's request for attorney fees and costs the trial court indicated that Tran had requested an award of $24,670, which consisted of attorney fees plus a $60 filing fee for the motion. However, the trial court recognized that "[w]hen a defendant is only partially successful, he or she may ordinarily recover a reduced amount of fees and costs commensurate with his or her level of success. (See *Jackson v. Yarbray* (2009) 179 Cal.App.4th 75, 82.)" It set forth its analysis in detail and concluded that Tran was entitled to recover from Eat Club a reduced amount, namely $8,250 in attorney fees incurred in preparing the motion and the $60 filing fee, for a total of $ 8,310.

"[U]nder . . . section 425.16, subdivision (c), any SLAPP defendant who brings a successful motion to strike is entitled to *mandatory* attorney fees." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131, italics added; see *id*. at p. 1141-1142 ["once the motion was successful, attorney fees were *mandatory* under . . . section 425.16, subdivision (c)"].) "We review the amount of attorney fees awarded for abuse of discretion. [Citation.]" (*Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1375.) " '[T]he appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' [Citation.]" (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 785.)

"The term 'prevailing party' must be 'interpreted broadly to favor an award of attorney fees to a partially successful defendant.' [Citation.] However, a fee award is not

required when the motion, though partially successful, was of no practical effect. [Citation.] '[A] party who partially prevails on an anti-SLAPP motion must generally be considered a prevailing party unless the results of the motion were so insignificant that the party did not achieve any practical benefit from bringing the motion. The determination [of] whether a party prevailed on an anti-SLAPP motion lies within the broad discretion of a trial court.' [Citation.]" (*Lin v. City of Pleasanton* (2009) 176 Cal.App.4th 408, 425-426.) The trial court could reasonably conclude that by prevailing on her anti-SLAPP motion as to the first cause of action, Tran achieved significant benefit. She effectively eliminated potential liability based on her May 31, 2018 statements to CFO Rodriguez concerning her potential role as a witness in other employees' litigation and narrowed the scope of Eat Club's lawsuit against her.

Here, the court impliedly found that Tran was the prevailing party but significantly reduced the requested attorney fees. Eat Club fails to demonstrate that the award made by the trial court constituted a manifest abuse of discretion.

## DISPOSITION

The March 8, 2018 order is affirmed. This court's September 4, 2019 temporary stay order is vacated, effective upon final disposition of this appeal. The petition for writ of supersedeas is denied. Eat Club shall bear costs on appeal.

38

                            _____

                            ELIA, J.


WE CONCUR:




_____

GREENWOOD, P.J.




_____

BAMATTRE-MANOUKIAN, J.




*Tran v. Eat Club*, *Inc.*
H046773